## 39325. CONNER v. THE STATE.

GREGORY, Justice.

Appellant, John Wayne Conner, was indicted in Telfair County for murder, armed robbery and motor vehicle theft. Because the state sought the death penalty for the murder, Conner's trial was conducted under the Unified Appeal Procedure set forth at 246 Ga. A-1 (1980), as amended, 248 Ga. 906 (1982).

At the time of the murder, Conner lived with his girl friend, Beverly Bates, in Milan. On the evening of January 9, 1982, they rode with friends, including the victim, J. T. White, to a party in Eastman. After spending the evening drinking and smoking marijuana, the group returned to Milan around midnight. J. T., described by one witness as "humble and satisfied" and by another as "mellow," exited the vehicle with Conner and Ms. Bates at their house. Soon afterwards, Conner and J. T. left the house on foot, taking with them a nearly empty bottle of bourbon that Conner had purchased the night before. They walked to the home of Pete Dupree, woke him up, and asked him to take them to get more whiskey. He refused.

Then, according to Conner: "[M]e and J. T. left and went down the road. J. T. made the statement about he would like to go to bed with my girl friend and so I got mad and we got into a fight and fought all the way over to the oak tree and I hit him with a quart bottle. He run over there to the fence trying to get through or across, I reckon, so I run over there and grabbed him and pulled him back and hit him again and he fell in the water and he grabbed my leg. I was down there at him right there in the ditch where he was at and he was swinging trying to get up or swinging at me to try to hit me one, and there was a stick right there at me, and I grabbed it and went to beating

him with it."

The next day, J. T.'s body was found in a drainage ditch near the Milan Elementary School. Injuries on his forehead bore the pattern of the sole of a tennis shoe. His nose was broken, both his cheekbones were fractured, his eyes were swollen, and his left ear was severely damaged. He had been hit so hard in the face with a blunt object that teeth, as well as portions of the bone to which they were attached, were broken away from his upper and lower jaws. Dr. Larry Howard, who conducted the autopsy, testified that the trauma to J. T.'s head and face caused brain damage and bleeding in and around the brain which extended into his lungs, causing him to drown in his own blood.

Beverly Bates had gone to bed when Conner and J. T. left. When Conner returned, he woke her up and told her that they had to leave; he had had a fight with J. T. and thought he was dead. Conner ripped off his shirt and threw it into the fire. He told Ms. Bates that he knew where a car was with its keys in it.

The car was parked in front of the school. Before they left town, Conner told Ms. Bates that "he had to be sure," and walked toward the ditch. She heard a thud. Conner returned, and said now he was sure, let's go. They stopped to get gas in Eastman. Ms. Bates gave Conner $20 to buy gas with; in return, he gave her a bloody $5 bill. They were caught in Butts County.

The $5 bill, as well as a whiskey bottle and a tree limb found near the body, were subsequently analyzed and found to have blood on them that was consistent with that of the victim and inconsistent with that of Conner (understandable, since Conner suffered no injuries during the "fight").

Conner presented no evidence, either at the guilt-innocence phase, or (against the advice of his attorney) at the sentencing phase of his trial. He was found guilty on all three counts and sentenced to death for the murder.

1. Appellant does not challenge the sufficiency of the evidence. However, Rule IV (B) (2) of the Unified Appeal Procedure requires this court to "determine whether the verdicts are supported by the evidence according to law." We find the evidence sufficient to support appellant's convictions for murder and motor vehicle theft, but we are unable to conclude that any rational trier of fact could have found all of the elements of the offense of armed robbery beyond a reasonable doubt. Jackson v. Virginia, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

"A person commits the offense of armed robbery when, with intent to commit theft, he takes property of another from the person or immediate presence of another by use of an offensive weapon . . ." OCGA § 16-8-41 (Code Ann. § 26-1902). The "taking of property is an

essential element of the crime of armed robbery." *Woodall v. State,* 235 Ga. 525, 533 (221 SE2d 794) (1975). The property alleged by the state to have been taken in the armed robbery was the bloody $5 bill which appellant subsequently gave to Ms. Bates.

No competent evidence was presented to show that prior to his murder, J. T. had money, or that appellant did not. Compare *Rivers v. State,* 250 Ga. 288 (1) (298 SE2d 10) (1982). The *only* circumstances which would support an inference that appellant took $5 from J. T. or from his immediate presence are two: (1) The money had J. T.'s blood on it, and (2) an empty leather pouch was found approximately eight and one-half feet from his body.

Appellant offered an explanation for the presence of blood on the money: In a pre-trial statement, appellant told an investigator that the $5 bill had been in the breast pocket of his shirt and had become saturated with the victim's blood during the fight. The leather pouch, which was not connected to J. T. except by its proximity to his body, had no blood on it.

"To warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused." OCGA § 24-4-6 (Code Ann. § 38-109). The evidence in this case does not meet this standard. "Only by speculation and conjecture could we assume that [appellant] . . . took the money, and speculation and conjecture will not sustain a conviction." *Woodall v. State,* supra.

Appellant's armed robbery conviction must be reversed.

2. Appellant enumerates as error the trial court's refusal to give three of his requests to charge:

(a) The trial court did not err in refusing to charge on self-defense. See OCGA § 16-3-21 (Code Ann. §§ 26-902, 27-207). Appellant's own statement refutes a theory of self-defense and no other evidence in the record supports such a claim.

Nor should the trial court have charged on self-defense because "self-defense [was] the only defense raised." See, e.g., *Jackson v. State,* 154 Ga. App. 867 (2) (270 SE2d 76) (1980). Where there is no evidence to support a theory of self-defense, it is no more "raised" than any other defense not supported by evidence.

(b) For the same reasons, the trial court did not err in refusing to charge on good character as a defense.

"[A] defendant may present evidence of his good character as a substantive fact indicative of his innocence." *Waters v. State,* 248 Ga. 355, 366 (5) (283 SE2d 238) (1981). Where he fails to do so, however, to charge on good character would give the defendant the benefit of evidence which was never introduced, and if it had been, it might

have been disputed. *Jones v. State,* 156 Ga. App. 56, 58 (3) (274 SE2d 99) (1980). See also, *McDaniel v. State,* 248 Ga. 494, 496 (4) (283 SE2d 862) (1981); OCGA § 24-9-20 (Code Ann. §§ 38-415, 38-416).

(c) The trial court did not err by failing to charge involuntary manslaughter, misdemeanor grade.

"A person commits the offense of involuntary manslaughter in the commission of a lawful act in an unlawful manner when he causes the death of another human being without any intention to do so, by the commission of a lawful act in an unlawful manner likely to cause death or great bodily harm . . ." OCGA § 16-5-3 (b) (Code Ann. § 26-1103). Appellant's theory in support of this charge is that he acted in self-defense (the lawful act) but used excessive force (the unlawful manner). However, not only was there no evidence that appellant acted in self-defense, " ' "[t]he number of wounds inflicted leaves no doubt on the question of intent or voluntariness." ' " *Anderson v. State,* 248 Ga. 682, 683 (1) (285 SE2d 533) (1982).

### Sentence Review

3. The jury found the following statutory aggravating circumstance: "The offense of murder was outrageously and wantonly vile, horrible and inhuman in that it did involve depravity of mind and aggravated battery to the victim." OCGA § 17-10-30 (b) (7) (Code Ann. § 27-2534.1).

The evidence supports this finding. Appellant chased an unarmed, intoxicated victim[1] (who failed to leave a mark on his assailant) from the road, across a drainage ditch and into a barbed wire fence;[2] dragged him back to the drainage ditch; used a whiskey bottle, a heavy stick and his feet to beat and stomp the victim to death; and left him to die, lying in the water. The evidence shows that the defendant unnecessarily and wantonly inflicted serious physical abuse upon the victim prior to his death.[3] The facts of this case distinguish it from those cases in which a finding of § (b) (7) would not be appropriate. Compare, *Phillips v. State,* 250 Ga. 336 (6) (297 SE2d 217) (1982).

---

[1] J. T.'s blood alcohol level was .27.

[2] A barbed wire fence on the side of the drainage ditch opposite the road had hair on it that was similar to that of the victim. The victim's coat had small, fresh tears on it consistent with damage from barbed wire.

[3] "Torture occurs when the victim is subjected to serious physical abuse before death." *Hance v. State,* 245 Ga. 856, 861 (3) (268 SE2d 339) (1980). "An aggravated battery occurs when '[a] person . . . maliciously causes bodily harm to another by . . . seriously disfiguring his body or a member thereof.' [OCGA § 16-5-24 (a) (Code Ann. § 26-1305)]." Ibid. The trial court in this case defined aggravated battery to the jury. See *Gilreath v. State,* 247 Ga. 814 (16) (279 SE2d 650) (1981).

4. Appellant contends that the trial court committed error requiring reversal of his sentence when the court charged: "Please be mindful of the previous instruction that *whether or not* you find the aggravating circumstances, you still then have the further duty to decide whether or not the death penalty should be imposed or whether the defendant should be sentenced to life imprisonment." (Emphasis supplied.)

The italicized portion of the instruction was incorrect. If the jury had failed to find at least one statutory aggravating circumstance, it would have had no further duty; the death penalty could not have been imposed. Instead of "whether or not," the trial court should have said "even if." It is well established, however, that " '[a] mere verbal inaccuracy in a charge, which results from a palpable "slip of the tongue," and clearly could not have misled or confused the jury' is not reversible error. *Siegel v. State,* 206 Ga. 252 (2) (56 SE2d 512) (1949)." *Gober v. State,* 247 Ga. 652, 655 (3) (278 SE2d 386) (1981). The charge, considered as a whole, clearly instructed the jury that it could not recommend a sentence of death unless it found at least one statutory aggravating circumstance, and that even if the jury found a statutory aggravating circumstance, it could nonetheless refuse to recommend a sentence of death. *Hawes v. State,* 240 Ga. 327 (9) (240 SE2d 833) (1977); *Fleming v. State,* 240 Ga. 142 (7) (240 SE2d 37) (1977). Thus, we find no reversible error in the court's charge.

5. An important aspect of our statutorily mandated independent review of death sentences is the requirement that we must determine whether or not the sentence of death "was imposed under the influence of passion, prejudice, or any other arbitrary factor." OCGA § 17-10-35 (c) (1) (Code Ann. § 27-2537). To make this determination, we must examine the entire record for the presence of factors improperly impacting on the decision to impose a sentence of death.[4]

Deciding the proper scope of this review is no mere matter of statutory interpretation; every decision to impose the death penalty implicates the procedural and substantive protections of the Eighth Amendment, and our review must, at a minimum, be sufficient to satisfy those protections. The ultimate arbiter of the extent of those

---

[4] In addition to the review of the sentence required by OCGA § 17-10-35 (Code Ann. § 27-2537), the Unified Appeal Procedure requires this court, in death penalty cases, to evaluate the sufficiency of the evidence supporting the conviction and to review assertions of error *timely raised* during the trial proceedings whether or not such assertions are enumerated as error on appeal. Rule IV (B) (2).

protections is, of course, the United States Supreme Court; we are not bound by decisions of the lower federal courts. Nonetheless, it would be unduly myopic of us to ignore federal precedent, if only because of the inevitability of federal collateral review of every death penalty which survives state scrutiny.

In Hance v. Zant, 696 F2d 940 (11th Cir. 1983), a panel of the Eleventh Circuit, noting our statutory requirement that a sentence of death may not be imposed under the influence of "passion, prejudice, or any other arbitrary factor," held that a "dramatic appeal to gut emotion" by the prosecutor in his closing argument was "con-stitutionally intolerable" and that a "sentence of death imposed after such an appeal cannot be carried out." Id. at 951, 952, 953.

In the case before us, as in every death penalty case, we have reviewed arguments of counsel. There are similarities between the argument of the prosecutor here and in Hance v. Zant. While the two arguments could be factually distinguished, the problem will undoubtedly arise in future cases, as well as in cases already tried and affirmed by us on appeal.[5] We feel compelled, in these circumstances, to decide whether Hance is correct in assuming that emotion is an altogether improper factor in a death penalty case.

The paucity of majority opinions by the U. S. Supreme Court in death penalty cases does not facilitate the task of determining the extent of Eighth Amendment protections. However, certain con-clusions can be drawn with reasonable assurance. First, the death penalty is not per se unconstitutional but (with possible rare exceptions) mandatory death penalty statutes are. Woodson v. North Carolina, 428 U. S. 280 (96 SC 2978, 49 LE2d 944) (1976); Roberts v. Louisiana, 428 U. S. 325 (96 SC 3001, 49 LE2d 974) (1976). Second, the discretion involved in death penalty sentencing can and must be "suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." Gregg v. Georgia, 428 U. S. 153, 189 (96 SC 2909, 49 LE2d 859) (1976). Third, "an individualized [sentencing] decision is essential in capital cases." Lockett v. Ohio, 438 U. S. 586, 605 (98 SC 2954, 57 LE2d 973) (1978).

The arbitrariness condemned in Furman v. Georgia, 408 U. S. 238 (92 SC 2726, 33 LE2d 346) (1972), is addressed in Georgia by a statutory scheme which allows the jury[6] to impose the death penalty only in those cases in which statutorily defined aggravating factors

---

[5] See, e.g., *Williams v. State,* 250 Ga. 553 (5) (300 SE2d 301) (1983); *High v. Zant,* 250 Ga. 693 (14) (300 SE2d 654) (1983).

[6] Or other trier of fact — for convenience we will call it the jury.

are present. This limitation on the jury's discretion helps "to distinguish cases in which the death penalty *is* imposed from the many cases in which it is *not." Phillips v. State,* 250 Ga. 336, 339 (297 SE2d 217) (1982). The proportionality review mandated by our Georgia death penalty law is a further protection against arbitrary decisions to impose the death penalty. *Zant v. Stephens,* 250 Ga. 97 (297 SE2d 1) (1982). Arbitrariness cannot be entirely eliminated, however, because the jury must be allowed, not only to consider, but to give "independent mitigating weight to aspects of the defendant's character and record and to circumstances of the offense proffered in mitigation." Lockett v. Ohio, supra, 438 U. S. at 605.

A statutory scheme giving the jury the absolute discretion to recommend mercy in any given case, see *Collier v. State,* 244 Ga. 553, 569 (261 SE2d 364) (1979), allows some arbitrariness because in factually similar cases one jury might recommend mercy while another might not. Nonetheless, such a scheme avoids the risk that the death penalty will be imposed in spite of factors "too intangible to write into a statute" which may call for a less severe penalty, and avoidance of that risk is constitutionally necessary. Lockett, supra.

In a death penalty case, the jury must first determine whether or not the defendant is guilty. At this stage of the proceedings, the jury must find facts, to which it applies the law. *Zant v. Stephens,* supra. Thereafter, it must determine whether a statutory aggravating circumstance exists.[7] Again, the jury must find facts. Ibid. If these two determinations are made in the affirmative, the jury considers all evidence in extenuation, mitigation and aggravation of punishment. The ultimate decision, i.e., whether to impose the death penalty, is not itself a factual one, but one made after the facts are established. Ibid.[8]

In Gregg v. Georgia, Justice Stewart noted the social purposes said to be served by the death penalty: retribution, deterrence, and incapacitation. 428 U. S. at 183.[9] Justice Stewart's discussion of retribution is particularly important, because it is clearly supported

---

[7] Except in cases of treason or aircraft hijacking, OCGA § 17-10-30 (c) (Code Ann. § 27-2534.1). In any case, of course, the jury may bypass this step and simply recommend a life sentence.

[8] See also, Gillers, *Deciding·Who Dies,* 129 U. Pa. L. Rev. 1, 45, 46, fn. 213 (1980).

[9] Rehabilitation is not a justification for the death penalty. A defendant's prospects for rehabilitation may, however, mitigate in favor of a sentence less than death. Cf., *Horton v. State,* 249 Ga. 871, 881 (14) (295 SE2d 281) (1982).

by a majority of the Supreme Court and because it demonstrates that an emotional response to properly admitted evidence regarding the defendant and his crime is not intrinsically unacceptable in death penalty cases:

"In part, capital punishment is an expression of society's moral outrage at particularly offensive conduct. This function may be unappealing to many, but it is essential in an ordered society that asks its citizens to rely on legal processes rather than self-help to vindicate their wrongs.

" 'The instinct for retribution is part of the nature of man, and channeling that instinct in the administration of criminal justice serves an important purpose in promoting the stability of a society governed by law. When people begin to believe that organized society is unwilling or unable to impose upon criminal offenders the punishment they "deserve," then there are sown the seeds of anarchy — of self-help, vigilante justice, and lynch law.' *Furman v. Georgia, supra,* [408 U. S.] at 308 (Stewart, J., concurring).

" 'Retribution is no longer the dominant objective of the criminal law,' *Williams v. New York,* 337 U. S. 241, 248 [69 SC 1079, 93 LE 1337] (1949), but neither is it a forbidden objective nor one inconsistent with our respect for the dignity of men. [Cits.] Indeed, the decision that capital punishment may be the appropriate sanction in extreme cases is an expression of the community's belief that certain crimes are themselves so grievous an affront to humanity that the only adequate response may be the penalty of death." Gregg v. Georgia, supra, 428 U. S. at 183, 184. (Footnotes omitted.)

In a footnote were these additional comments:

"Lord Justice Denning, Master of the Rolls of the Court of Appeal in England, spoke to this effect before the British Royal Commission on Capital Punishment:

" 'Punishment is the way in which society expresses its denunciation of wrong doing: and, in order to maintain respect for law, it is essential that the punishment inflicted for grave crimes should adequately reflect the revulsion felt by the great majority of citizens for them. It is a mistake to consider the objects of punishment as being deterrent or reformative or preventive and nothing else. . . . The truth it that some crimes are so outrageous that society insists on adequate punishment, because the wrong-doer deserves it, irrespective of whether it is a deterrent or not.' Royal Commission on Capital Punishment, Minutes of Evidence, Dec. 1, 1949, p. 207 (1950).

"A contemporary writer has noted more recently that opposition to capital punishment 'has much more appeal when the discussion is merely academic than when the community is confronted with a

crime, or a series of crimes, so gross, so heinous, so cold-blooded that anything short of death seems an inadequate response.' Raspberry, Death Sentence, The Washington Post, Mar. 12, 1976, p. A27, cols. 5-6." Gregg, 428 U. S. at 184 (fn. 30).

"Moral outrage," "grievous affront to humanity," "revulsion," "gross," "heinous," and "cold-blooded," are certainly not phrases devoid of emotional content.

The Fifth Circuit has noted that the "exercise of mercy . . . can never be a wholly rational, calculated, and logical process." Washington v. Watkins, 655 F2d 1346, 1376 fn. 57 (5th Cir. 1981). It necessarily follows that the refusal to exercise mercy can never be a wholly rational, calculated, and logical process.

We are required by OCGA § 17-10-35 (c) (1) (Code Ann. § 27-2537) to invalidate any death penalty based on "passion, prejudice, or any other arbitrary factor." The Eleventh Circuit was doubtless influenced, in Hance, by the inclusion of the word "passion" in the code. As we have seen, however, the imposition of the death penalty can never be a wholly rational, calculated, or logical process.

We hold that the "passion" proscribed by our law does not encompass all emotion, but only that engendered by prejudice, particularly racial prejudice,[10] or other arbitrary factors. See, Cape v. State, 246 Ga. 520 (11) (272 SE2d 487) (1980); Blake v. State, 239 Ga. 292, 296 (2) (236 SE2d 637) (1977); Coley v. State, 231 Ga. 829, 834 (204 SE2d 612) (1974).

The scope of our review under OCGA § 17-10-35 (c) (1) (Code Ann. § 27-2537) is broad. We have recognized that "a jury's recommendation of the death penalty could not properly be based on constitutionally impermissible reasons, such as race or religious preference." Horton v. State, supra, 249 Ga. at 874. We have set aside death penalties where the trial court failed to properly charge the jury at the sentencing phase, whether or not such failure was objected to at trial or raised on appeal. See, e.g., Rivers v. State, 250 Ga. 303, 310-311 (8(a), 9) (298 SE2d 1) (1982); Hawes v. State, 240 Ga. 327 (9) (240 SE2d 833) (1977); Fleming v. State, 240 Ga. 142 (7) (240 SE2d 37) (1977). We have reversed death penalties when the defendant was erroneously denied the opportunity to present mitigating evidence, Sprouse v. State, 250 Ga. 174 (296 SE2d 584) (1982); Cobb v. State,

---

[10] See Spinkellink v. Wainwright, 578 F2d 582, 614 fn. 38 (5th Cir. 1978): "In later Supreme Court opinions . . . [cits.] . . . when the Court spoke of Furman's condemnation of arbitrary and capricious imposition of the death penalty, implicit in its definition of arbitrariness and capriciousness was racial discrimination."

244 Ga. 344 (28) (260 SE2d 60) (1979); *Sprouse v. State,* 242 Ga. 831 (5) (252 SE2d 173) (1979); or where the Witherspoon voir dire was not recorded, *Owens v. State,* 233 Ga. 869 (2) (214 SE2d 173) (1975). We have considered alleged Witherspoon errors on their merits whether or not objections were made at trial. *Castell v. State,* 250 Ga. (7(b)) (301 SE2d 234) (1983); *Davis v. State,* 236 Ga. 804 (1) (225 SE2d 241) (1976). And we have examined allegedly improper argument whether or not objected to at trial. See, e.g., *Horton v. State,* supra at 875, 876; *Gilreath v. State,* 247 Ga. 814 (15) (279 SE2d 650) (1981); *Thomas v. State,* 240 Ga. 393 (7) (242 SE2d 1) (1977); *Prevatte v. State,* 233 Ga. 929 (6) (214 SE2d 365) (1975). What we have not done is invalidate a death penalty simply because the prosecutor made an impassioned argument to the jury during the sentencing phase of the trial.

We think it is clear that neither the Eighth Amendment nor OCGA § 17-10-35 (c) (1) (Code Ann. § 27-2537) forbids a death penalty based in part on an emotional response to factors in evidence which implicate valid penological justifications for the imposition of the death penalty. Perforce, argument by the prosecutor which "dramatically appeals" to such legitimate emotional response is not "constitutionally intolerable." To the extent that Hance v. Zant holds to the contrary, we must disagree.

6. In this case, the prosecutor informed the jury that he had been involved in criminal law for seven years and that as district attorney for the circuit, had prosecuted nine murder cases. He told the jury that he had never before sought the death penalty, but he was seeking it now.

"The range of discussion [during closing argument] is wide — very wide . . .[11] [I]n his addresses to the Jury it is [counsel's] right to descant upon the facts proven or admitted . . .; to arraign the conduct of the parties; impugn, excuse, justify or condemn motives, so far as they are developed in evidence; assail the credibility of witnesses, when that is impeached by direct evidence, or by the inconsistency or incoherence of [their] testimony, [their] manner of testifying, [their] appearance, or by circumstances. His illustrations may be as various as are the resources of his genius; his argumentation as full and profound as his learning can make it; and he may, if he will, give play to his wit, or wing to his imagination." *Mitchum v. State,* 11 Ga. 615, 631 (1852). "Counsel may bring to his use in the discussion of the case well-established historical facts and may allude to such principles of divine law relating to transactions of men as may be appropriate to

---

[11] See Gregg: "We think that the Georgia court wisely has chosen . . . to approve *open and far-ranging* argument." 428 U. S. at 203. (Emphasis supplied.)

the case." *Western & Atlantic R. Co. v. York,* 128 Ga. 687, 689 (58 SE 183) (1907). Counsel for the state may forcibly or even extravagantly attempt to impress upon the jury "the enormity of the offense and the solemnity of their duty in relation thereto." *Patterson v. State,* 124 Ga. 408, 409 (52 SE 534) (1905).

However, counsel should not " 'go outside the facts appearing in the case . . . and lug in extraneous matters as if they were a part of the case . . .' " *Smith v. State,* 74 Ga. App. 777, 792 (41 SE2d 541) (1947). "What the law condemns is the injection into the argument of extrinsic and prejudicial matters which have no basis in the evidence." *Floyd v. State,* 143 Ga. 286, 289 (84 SE 971) (1915).

The portion of the prosecutor's argument referring to his prior criminal experience and the frequency with which he had sought the death penalty was not supported by any evidence and, moreover, was not relevant to any issue in the case. The argument was therefore improper.

As in Hance, no objection was made to these remarks. Were this not a death penalty case, such unobjected to remarks would present nothing for review. *McAllister v. State,* 231 Ga. 368 (1) (202 SE2d 54) (1973); *Scott v. State,* 229 Ga. 541 (6) (192 SE2d 367) (1972). Since this is a death penalty case, we have reviewed these remarks and conclude that they are not so prejudicial or offensive and do not involve such egregious misconduct on the part of the prosecutor as to require reversal of appellant's death sentence on the basis that it was impermissibly influenced by passion, prejudice, or any other arbitrary factor.

7. After review of the record in this case, including matters dealt with in Divisions 1 and 6 of this opinion, we conclude that the sentence of death was not imposed under the influence of passion, prejudice, or other arbitrary factors.[12]

8. Appellant's sentence is not excessive or disproportionate to the penalty imposed in similar cases, considering the crime and the defendant. The similar cases listed in the appendix support the affirmance of the death penalty.

*Judgment affirmed in part; reversed in part. All the Justices concur.*

Decided May 24, 1983 —
Rehearing denied June 28, 1983.

---

[12] We note that although the jury erroneously convicted appellant of armed robbery, it did not find that the armed robbery was a statutory aggravating circumstance supporting the murder, although given the opportunity to do so.

*W. Dennis Mullis,* for appellant.

*James L. Wiggins, District Attorney, Michael J. Bowers, Attorney General, Janice G. Hildenbrand, Staff Assistant Attorney General,* for appellee.

APPENDIX.

*Williams v. State,* 250 Ga. 553 (300 SE2d 301) (1983); *Smith v. State,* 249 Ga. 228 (290 SE2d 43) (1982); *Cunningham v. State,* 248 Ga. 558 (284 SE2d 390) (1981); *Cervi v. State,* 248 Ga. 325 (282 SE2d 629) (1981); *Cape v. State,* 246 Ga. 520 (272 SE2d 487) (1980); *Hance v. State,* 245 Ga. 856 (268 SE2d 339) (1980); *Hamilton v. State,* 244 Ga. 145 (259 SE2d 81) (1979); *Alderman v. State,* 241 Ga. 496 (246 SE2d 642) (1978); *Thomas v. State,* 240 Ga. 393 (242 SE2d 1) (1977).