41665. CONKLIN v. THE STATE.
(331 SE2d 532)

CLARKE, Justice.

This is a death penalty case. Appellant, Robert Dale Conklin, was convicted in Fulton County for the murder of George Crooks. The case is here for consideration of Conklin's direct appeal, for review of the case under the Unified Appeal Procedure (252 Ga. A-13 et seq.), and for the sentence review required by OCGA § 17-10-35.[1] We affirm.

---

[1] The jury returned its sentencing verdict June 16, 1984. Conklin filed a motion for new trial on July 2, 1984, which was amended August 29, 1984, heard on August 30, 1984, and denied the same day. The case was docketed in this court on October 29, 1984, and orally argued January 14, 1985.

## The Evidence

Several of Conklin's enumerations of error question the sufficiency of the evidence supporting the conviction for malice murder and the death sentence imposed for that offense. These enumerations do not seriously question the sufficiency of the evidence to show that Conklin "caused the death of" George Crooks (OCGA § 16-5-1 (a)) and we need not dwell at length on this aspect of the state's proof except to note that papers and other tangible items found near the body, evidence found in Conklin's apartment, and his own statements and testimony overwhelmingly establish that he killed George Crooks.

The contested issues here include provocation, justification and the jury's finding that the murder "was outrageously or wantonly vile, horrible, or inhumane, and that [it] involved depravity of mind by the perpetrator." See OCGA § 17-10-30 (b) (7). Therefore, we set forth below those portions of the evidence which bear on these issues. We begin with Conklin's own statement, given after his arrest to law enforcement officers: "I first met George Crooks at a rest stop off of I-20 by Douglasville. Over a period of time we established a relationship. We would see each other every couple or three weeks. I moved out to my apartment on Copeland Road. Every now and then he would come over and spend the night or I would go over there and spend the night. We would usually get high, have sex and go to sleep. On Monday night, he came over, we got stoned. He didn't drink but I did. He was in Alcoholics Anonymous and would not drink, but he did get high that night. We got high by smoking pot. Later on that evening we went on and went to bed and I wanted to go to sleep and he wanted to play. He kept messing with me and it turned into a wrestling match. I got tired of it, told him to quit and he wouldn't. This went on for quite a while, an hour to an hour and a half, I guess. At this point I was getting pretty mad because he wouldn't leave me alone, so eventually he had me pinned on the bed sitting on my stomach. I was wrestling trying to get free. I was mad but he thought it was all a big joke. Eventually I got an arm free and I did hit him and he hit me back. He was still sitting on me. We were there struggling and I reached over and grabbed a screwdriver. I swung the screwdriver and it stuck into him. He rolled off the bed and I followed him screwdriver in hand. I held him down and I stuck the screwdriver in his ear, I wiggled it around and I realized what I had done and got scared. I went ahead and got a blanket and I tried to stop him from bleeding but I think he was already dead. So I wrapped him up in the blanket and I drug him into the bathroom. Since he was bleeding, I tried to put him in the bath tub and I couldn't. He was too heavy and the shower curtain was in the way. So I went ahead and got a screwdriver downstairs, took the shower curtain down. I was able to go

ahead and get his body into the bath tub. He was still bleeding and everything. At this point I panicked. There was blood all over the place, I think it was on the sheets, I'm pretty sure on the blanket, walls and all over the bathroom. At this point, I stopped and tried to think about what to do. I came to the conclusion that since I was on parole, it wouldn't be in my best interest to get caught and have it discovered that I had killed this person. So I decided I had to get rid of the body some way. I couldn't move him, he was too big, too heavy, so I thought if I let the blood drain out he would be lighter, so I went ahead and got a steak knife from downstairs and tried to cut his throat and bleed him into the bathtub. That did not work too good. So I went ahead and tried to tie his feet up several ways so his feet was up and his head was down. Tried to use a neck tie but it broke. Eventually I just propped his feet up and left him like that with the water running. I went ahead and cleaned myself up and got the blood off of me. I tried to figure out what to do. I was scared and since I was on parole I didn't want to go to the police. I decided I had to get rid of the body some way, so I sat down and planned what to do. I couldn't pick him up and carry him, he was too big, and I didn't want to involve anyone else. So I decided I had to get rid of the body somehow and to get rid of his car and his possessions and everything else. By now it was Tuesday morning. I don't know what time. So I went ahead and took his keys and his wallet, Honest Face card, and I got into his car. I then went ahead and went to his apartment so I could get anything there that would connect me with him. I took a card with my name and number on it and the tape out of his answering machine then put another fresh tape in. Since I had his Honest Face card and his checkbook, I drove around to several grocery stores and started to get cleaning supplies. The idea was to get cleaning supplies and the stuff to finish cleaning up the place at the apartment. While doing this I realized there was no way I could get rid of the body because I couldn't pick him up, so I thought if I were to cut him in half I could put him in a couple of garbage bags that I could remove him from the apartment. I also bought some other things, food, knives and other things, and I wrote some checks. After I did this, I brought all the stuff back to the apartment. He still hadn't lightened any from the bleeding all that much, so I used one of the knives to go ahead and cut his throat some more. It was a lot sharper than the steak knives. I realized I had to get rid of his car some how, so I drove it downtown. On the way downtown it ran out of gas so I pushed it into a parking lot. I think it was Sears in Buckhead. I wiped it down and took everything out of it and tried to catch a bus back to where I live; caught the wrong bus on the wrong road. I was on Paces Ferry Road. So I rode that bus to Paces Ferry Crossing and I caught a cab back to my apartment. When I got there I went ahead and went to work to

cut him in half so I could get him out of there. After I had done that, he was still too big to move, too heavy, so I decided I had to cut him in smaller pieces. All of this I did in the bathtub. For most of the day I went ahead and worked on him. It was a big mess, I'm telling you. I decided there would be less of him to move if I could put some of him down the garbage disposal. Fortunately [sic], he would not fit, so I cut him up in even smaller pieces. These I was able to stuff into the garbage disposal, but it turned out that the garbage disposal would not accept him. So I pulled all that out, took it back upstairs to the bathroom and cleaned up the kitchen and everything the best I could. I then went ahead and cut the rest of him up in small enough pieces to put in the bags. Before I could get all of this done I got a call from a friend of mine who was in the neighborhood and he said he was going to stop over. Since normally I tell him to come over, I told him to come on over. It was D— M— and his wife. I cleaned up everything downstairs before he got there the best I could. Between 3:00 o'clock and 5:00 that evening, I had gone to a meeting for work. I was gone for a couple of hours. And D— came over about 7:00 or 8:00 o'clock. Shortly after he was there, another friend showed up, S— L—. And D— and his wife left and S— and I sat around and drank beers. After a while S— left and I went back upstairs, finished putting him in the bags. I found that I couldn't even carry all the bags, so I went to K-Mart and bought a garbage can. I think it was also at Handy City I bought a push cart to put the can on so I could move the can. I went ahead and filled up the garbage can with these bags and they would not all fit, so I left some of the bags with George in them outside. Later on that night it started to rain, so I went ahead and took the trash can with the cart, took it to the dumpster, unloaded all the bags. Before I did this I cleaned up the bathroom. I also took the sheets, blankets and other stuff and put that in the trash can with him. I don't remember if it took two or three trips. I know it took at least two trips to get all that out there. I then went back and cleaned the apartment some more trying to get the blood and everything else up. Eventually I fell asleep on the couch and I woke up the next day. I had to be at work so I went ahead and took a shower, got ready for work and I was running late so I didn't finish cleaning up everything. I went out to my car, got into my car and drove around the building the way I usually go. But when I turned the corner, I noticed there was a tape across the road and people were digging stuff out of the dumpster. I didn't know if they would connect me with it or not but I decided it would be to my best interest not to be around. So instead of going to work, I went ahead and drove around to try to figure things out awhile. I decided that it wouldn't be a good idea to go back to the apartment unless I knew for sure that I wasn't a suspect. Then I decided that it would be best that I left altogether and assume that

I was a suspect until I found out otherwise. I went ahead and got all my money from my bank account using my bank card. I then went downtown, parked my car at the Holiday Inn and wandered around town. I checked the bus station and eventually decided to buy a ticket for Miami. After I had been in Miami a couple, or was it two days, I decided it was not where I wanted to be so I hitchhiked back to Atlanta where I found out I was being sought. I had no place to go and I was broke and hungry. I went back to my apartment where I found the police had already been. I stayed there anyways because I didn't think anyone would be by until that Monday. It was last night, Saturday night, I was discovered and chased. I didn't get to take anything that I had planned on taking when I left, I just left as quickly as possible. So after hiding all night I went back to the apartment to get the stuff that I had left. It wasn't there so I went ahead and got what I could and decided to catch a bus downtown again. On the way to the bus stop I was caught and here I am."

Although his statement mentioned only two wounds having been inflicted prior to death, Conklin admitted in his trial testimony that after Crooks had been stabbed once and rolled off the bed, and after Conklin, sitting on top of Crooks, had "stuck [the screwdriver] in his ear," he had stabbed Crooks a number of additional times while Crooks continued to struggle, saying "give me the screwdriver."

Crooks' body was found in parts in 9 garbage bags as follows:

a. Head with most of the neck, and both hands
b. Right upper torso, shoulder, and arm
c. Lower legs with feet attached
d. Buttocks and pelvic bones
e. Thigh muscle and skin
f. Left upper torso, shoulder and arm
g. Rib cage (with internal organs removed) and spine
h. Two thigh bones (from which the musculature had been removed and put in bag e, above) and the genitalia
i. Lungs, heart, and portions of the liver, kidney, spleen and intestines.

Blood-soaked bed-clothes were also found in the dumpster. The bed in Conklin's apartment had no bed-clothes on it and the mattress was blood-soaked. (The blood on the mattress and the bed-clothes was identified as the victim's.) Inside the garbage disposal were additional internal organ fragments.

Dr. Saleh Zaki conducted the autopsy. He testified that eight stab wounds on the right side of the victim's neck were in his opinion ante-mortem (inflicted prior to death). There was another stab wound in the left ear area which penetrated the upper part of the ear, cut through the ear canal, and extended into the left mastoid area. This wound also was ante-mortem. In addition, there were several areas of

bruising about the head and neck that were consistent with blunt-force trauma, i.e., the head hit a blunt object or vice versa. In the lower right side of the neck were two additional ante-mortem stab wounds, one of which penetrated the left lung. In Dr. Zaki's opinion, death was caused by stab wounds to the chest and neck, with a contributing factor being blunt-force trauma to the head and neck.

Conklin admitted at trial that, at least initially, he did not think Crooks was trying to hurt him and that "if he would have hit me as hard as he could [when they were in bed and Crooks was on top], then he would have certainly knocked me out if not done more damage than that." Several witnesses testified that the day following Crooks' death, Conklin was not visibly bruised or otherwise injured, except for a cut on one of his fingers. Conklin testified that he cut his finger in the kitchen while trying to dispose of the various body parts.

## Enumerations of Error

1. In his first two enumerations of error, Conklin contends the evidence is insufficient to support the conviction for malice murder, and he complains of the trial court's refusal to either direct a verdict of acquittal or, at least, to reduce the charge to voluntary manslaughter.

(a) The indictment alleges that Conklin "did unlawfully and with malice aforethought cause the death of George Grant Crooks, a human being, by striking and beating him with some object which to the Grand Jurors is unknown, and by stabbing him with a knife."

Conklin argues that since the indictment makes no mention of a screwdriver, the state impliedly concedes that the screwdriver wounds were justified. However, we cannot agree that anything in the indictment can be reasonably construed as an admission by the state that Conklin was justified in wounding Crooks with a screwdriver.

Next, he argues that the state failed to prove that knife wounds were the cause of death. We take this to be an allegation of fatal variance, i.e., the indictment alleges knife wounds when the proof shows screwdriver wounds as causing death.

We note that the indictment also alleges that Conklin killed his victim "by striking . . . him with some object . . . unknown." Moreover, Dr. Zaki testified that some of the neck wounds (which contributed to the victim's death) were more consistent with having been inflicted by a knife than by a screwdriver. Thus, it is factually incorrect to say that the indictment alleged a death caused only by knife wounds while the evidence showed a death caused only by screwdriver wounds. However, even if that had been the case, such a variance would not be so material as to require reversal of the conviction. *DePalma v. State*, 225 Ga. 465 (169 SE2d 801) (1969).

(b) Conklin contends that since his own statement negates malice and establishes justification, and is consistent with the rest of the evidence, his conviction may not stand. See *Harrell v. State*, 108 Ga. App. 295 (2) (132 SE2d 787) (1963).

We disagree.

First, Conklin's statements and testimony show: (1) Conklin became angry and stabbed Crooks at a time when Crooks was not trying to hurt him; (2) Conklin continued to stab Crooks after the latter was on the floor, injured, and Conklin was on top of him; and (3) Crooks was still bleeding (and by inference, still alive) when he was put in the bathtub and Conklin's only concern at that point was to cut the victim's throat so that he would bleed more and thus be lighter.

Second, the blood-soaked mattress and bed-clothes are inconsistent with Conklin's claim that all but the first stab wound were inflicted after Crooks was on the floor, and the fact that Conklin suffered no discernible injury, despite his claim that there was a "struggle," undermines his claim of justification.

Third, Conklin's act of butchery after the victim died is (contrary to his persistent contention throughout the trial) highly probative circumstantial evidence of his state of mind at the time of the killing. Indeed, a set of circumstances more compellingly demonstrating an "abandoned and malignant heart" would be hard to imagine. OCGA § 16-5-1 (b).

The evidence is amply sufficient to support the conviction for malice murder. *Pollard v. State*, 249 Ga. 21 (287 SE2d 189) (1982); *Anderson v. State*, 248 Ga. 682 (285 SE2d 533) (1982); *Terry v. State*, 243 Ga. 11 (252 SE2d 429) (1979); *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979). It follows that the trial court did not err by refusing to direct a verdict of acquittal or to present the case to the jury only upon a manslaughter theory.

2. The death penalty can be imposed only if the jury finds the existence of at least one of ten statutorily enumerated aggravating circumstances. See OCGA § 17-10-30 (b) (1-10). The § (b) (7) circumstance found here "consists of two major components, the second of which has three sub-parts, as follows: (I) The offense of murder was outrageously or wantonly vile, horrible or inhuman (II) in that it involved (A) aggravated battery to the victim, (B) torture to the victim, or (C) depravity of mind of the defendant . . . [T]he evidence must be sufficient to satisfy the first major component of the statutory aggravating circumstance and at least one sub-part of the second component . . ." *Hance v. State*, 245 Ga. 856, 860-61 (268 SE2d 339) (1980).

Here, the trial court instructed the jury on this statutory aggravating circumstance following our suggested charge on this circumstance appended to *West v. State*, 252 Ga. 156 (313 SE2d 67) (1984)

(omitting, however, any reference to the aggravated battery sub-part of the second component — see id. at 160). The jury found the first component — that the murder was outrageously or wantonly vile, horrible or inhuman[2] — and one sub-part of the second component — depravity of mind.

In his 15th and 16th enumerations, Conklin complains of the court's charge and the jury's findings regarding this statutory aggravating circumstance.

(a) He argues that the trial court erred by failing to give instructions clarifying the meaning of the phrase "outrageously or wantonly vile, horrible or inhuman." However, we have held that these words are subject to common understanding and need no clarification. *Hance v. State*, supra. We adhere to that view.

(b) Conklin argues that even if post-mortem mutilation of a body may show depravity of mind, it is insufficient to support a finding that the *"offense of murder"* was "outrageously or wantonly vile, horrible or inhuman." We cannot agree that the "offense of murder" terminates at the instant of death, so that nothing that happens afterward can be considered in determining whether the offense of murder is outrageously or wantonly vile, horrible or inhuman. Compare *Horton v. State*, 249 Ga. 871 (11) (295 SE2d 281) (1982). Nor can we agree with Conklin's contention that, as a matter of law, this case involves an "ordinary murder[ ] for which the penalty of death is not appropriate." *Hance v. State*, supra at 861.

(c) Conklin further argues that in order for a finding of this statutory aggravating circumstance to be upheld, torture or aggravated battery must be found in addition to depravity of mind. However, we specifically stated otherwise in *Hance*, and it is clear that a finding of the § (b) (7) circumstance must include only one of the three subparts of the second component of that circumstance. Here, the court explained torture and depravity of mind and the jury, having benefit of this explanation, found depravity of mind and not torture. Clearly, the jury understood these terms, and applied them in a manner appropriate to the facts of this case. Compare *Burger v. Zant*, 718 F2d 979, 984-985 (11th Cir. 1984).

(d) The aggravating circumstance found in this case is supported by the evidence beyond a reasonable doubt. OCGA § 17-10-35 (c) (2); *Jackson v. Virginia*, supra.

3. Over objection, the death certificate prepared by Dr. Zaki was admitted in evidence (with certain portions deleted). It stated, in pertinent part, that the "immediate cause" of death was "stab wounds to

---

[2] The jury's verdict used the word "inhumane" rather than "inhuman." However, these two words mean essentially the same thing. Webster's New World Dictionary of the American Language (World Publishing Co. 1970).

neck and chest" with "other significant conditions" being "head and neck trauma."

(a) In his 3rd enumeration, Conklin contends the report should have been suppressed because it was a scientific report that the state did not furnish to the defense despite a timely written request. See OCGA § 17-7-211.

We do not agree.

A death certificate is not specifically listed in OCGA § 17-7-211. Moreover, it is an item of public record, accessible to all. OCGA § 31-10-25 (f). We are confident that OCGA § 17-7-211 was not meant to provide sanctions for the failure to provide public information to which the defendant already had access.[3] Therefore, we find no violation here.

(b) In his 4th enumeration Conklin contends that in any event the death certificate should not have gone to the jury room. See *Royals v. State*, 208 Ga. 78 (65 SE2d 158) (1951). We disagree, and find the death certificate, as amended, to have been properly admitted. *Dunn v. State*, 251 Ga. 731 (2) (309 SE2d 370) (1983); *King v. State*, 151 Ga. App. 762 (2) (261 SE2d 485) (1979).

4. The trial court did not err by denying Conklin's non-specific requests for expert assistance in the absence of a proper showing of a need for such assistance. See *Sabel v. State*, 248 Ga. 10 (282 SE2d 61) (1981); *Ake v. Oklahoma*, ___ U. S. ___ (105 SC 1087, ___ LE2d ___) (1985). Enumeration 5 is without merit.

5. By timely written request, Conklin asked the court to charge: "A person in his own home has no duty to retreat." The request to charge was denied and no other charge was given outlining the principles of retreat. In his 6th and 7th enumerations, Conklin complains of these omissions.

(a) The request to charge was, by reason of incompleteness, an incorrect statement of the law. There is no duty to retreat "if the circumstances are sufficient to excite the fears of a reasonable man that a felonious assault is about to be made upon him, and the slayer, who is free from blame, acts under the influence of such fears . . . One who is himself to blame, however, has not the same right of standing his ground . . ." *Glover v. State*, 105 Ga. 597, 598-99 (31 SE

---

[3] Despite the state's contention that the admission of the death certificate was somehow required by the best evidence rule, in fact, both the fact of death and the cause of death may be and usually are established by oral testimony. See *Merrill Lynch v. Zimmerman*, 248 Ga. 580 (285 SE2d 181) (1981). To hold that in a murder case the state must respond to a § 17-7-211 request by the production of the death certificate would very possibly penalize the failure to do so not only by the exclusion of the certificate (which the state may not have intended to use anyway) but also by the exclusion of the testimony of the physician who prepared it. See *Odom v. State*, 248 Ga. 434 (3) (283 SE2d 885) (1981).

584) (1898).[4]

The court did not err by denying the request to charge as submitted.

(b) In *Johnson v. State*, 253 Ga. 37, 39 (315 SE2d 871) (1984), we held that even without a timely and proper written request, where "self-defense is the sole defense, and the issue of retreat is raised by the evidence or placed in issue, the defense is entitled to a charge on the principles of retreat as set forth in *Glover*."

The question, then, is whether the court erred by failing to charge on retreat despite the lack of a proper request. We conclude that the answer is no.

We observed in *Johnson* that "the statutory charge on justification is sufficient in most cases." Id. at 38. Here, in contrast to *Johnson*, the state did not raise the issue of retreat, nor was self-defense the sole defense. (In addition, Conklin contended that the state had failed to prove absence of provocation.) *Johnson* is therefore inapplicable, and we find no error here.

6. The court charged: "The defendant enters upon the trial of this case with a presumption of innocence in his favor. That presumption remains with him throughout the trial of the case until and unless the state produces evidence in your presence and hearing sufficient to satisfy your minds beyond a reasonable doubt of the defendant's guilt of the offense charged."

In his 8th enumeration, Conklin contends the charge was defective because the court did not say that the presumption of innocence is "in the nature of evidence." We find no error. *Ford v. State*, 164 Ga. App. 620 (2) (298 SE2d 327) (1982).

Nor can we agree with the further contention that the trial court committed reversible error by only telling the jury what a reasonable doubt *is not*, and not what it *is*. Compare *Foster v. State*, 240 Ga. 858 (4) (242 SE2d 600) (1978).

7. The trial court did not err by instructing the jury in accordance with the "better practice" outlined in *Alexander v. State*, 247 Ga. 780, 784 (279 SE2d 691) (1981). Conklin's 9th enumeration is without merit.

8. In his 10th enumeration, Conklin complains of the exclusion of testimony by an attorney who had known the victim and had observed specific acts of violence and displays of temper by the victim.

We find no error. "Although a defendant may in certain circumstances introduce evidence of specific acts directed by the victim toward the defendant to show defendant's reasonable belief that he is

---

[4] We note that the case cited as authority for the requested charge also states: "A man who is himself the aggressor, or who needlessly resumes the fight, gains no immunity because he kills in his own dwelling." *People v. Tomlins*, 107 NE 496, 498 (N.Y. 1914).

being assailed by the victim so as to support a defense of self-defense, evidence of specific acts of violence toward others is not admissible to prove reputation for violence." *Harrison v. State*, 251 Ga. 837, 839 (310 SE2d 506) (1984). See also *Henderson v. State*, 234 Ga. 827 (1) (218 SE2d 612) (1975); *Waters v. State*, 248 Ga. 355, 366 (283 SE2d 238) (1981).

9. Dr. Zaki brought to the courtroom a number of slide photographs taken during the autopsy. Out of the presence of the jury, the issue of their admissibility was addressed. All but one were excluded as irrelevant to the limited purpose for which they were offered (to show the cause of death), or were otherwise inadmissible for reasons stated in *Brown v. State*, 250 Ga. 862 (5) (302 SE2d 347) (1983). The jury returned, and Dr. Zaki began his testimony. The prosecutor turned on the slide projector and asked the doctor to identify the photograph. It was the wrong one. The machine was turned off and the jury was sent to the jury room. The record shows that all the slides had been removed from the machine except two — the one that had been ruled admissible and one which showed the top of the victim's head with the scalp pulled back. The latter photograph was displayed for three to four seconds. No testimony was presented in connection with this photograph.

Conklin's attorneys moved for a mistrial. The court denied the motion, finding as a fact that the display was accidental, and expressing doubt that any of the jurors knew what the photograph portrayed, absent any testimony to explain it. Defense counsel asked the court to forego curative instructions, and none were given.

In his 11th enumeration, Conklin contends the court erred by denying the motion for mistrial.

It is well settled that the decision whether to grant a mistrial is one committed to the sound discretion of the trial court. See, e.g., *Sabel v. State*, 250 Ga. 640 (5) (300 SE2d 663) (1983). Moreover, "[w]here counsel requests that no curative instruction be given to the jury, the trial court is not obliged to do so, and the denial of the motion for a mistrial is generally not an abuse of discretion." *Dowdy v. State*, 169 Ga. App. 14, 16 (311 SE2d 184) (1983). Accord *Prince v. State*, 252 Ga. 82 (4) (311 SE2d 433) (1984).

The photograph in issue here was correctly ruled inadmissible by the trial court. *Brown v. State*, supra. However, considering that the display of the photograph was brief, inadvertent, and unaccompanied by any explanatory testimony, and that any mutilation of the body during the autopsy pales in comparison to the mutilation inflicted by the defendant himself, we find no abuse of discretion in the refusal to grant a mistrial.

10. After the evidence closed at the guilt-innocence phase of the trial, a charge conference was held outside the presence of the jury,

and the court considered the defendant's written requests to charge. (The state had none.) As required by law, the court "inform[ed] counsel of its proposed action upon the requests prior to their arguments to the jury . . ." OCGA § 5-5-24. The jury then returned to the courtroom and the state was given permission to begin its argument.

Instead of immediately arguing to the jury, the prosecutor began the ancient ritual of "reading law" to the court. See *McMath v. State*, 55 Ga. 303 (8) (1875). Inter alia, the prosecutor stated: "The next case I would like to bring to the court's attention is the case of *Myrick v. State.* That's at 199 Georgia, page 244, at page 248 [(34 SE2d 36) (1945)]. This, also, is a Georgia Supreme Court decision. In that case it was held that a presumption of malice may arise from a wreckless [sic] disregard for human life. A wanton and wreckless [sic] state of mind is sometimes the equivalent of a specific intent to kill."

When the prosecutor finished "reading law," the court instructed the jury as follows:

"Now, ladies and gentlemen of the jury, what the lawyer reads to the judge in this fashion is not to be taken by you as the law. You will get your instructions of law from the trial judge in the instructions shortly. The law does permit this procedure to be followed where the lawyers can read to the judge in the presence of the jury certain contentions of what they contend the law is.

"You will get your instructions of law from the trial judge later on in the instruction stage."

After closing arguments were made by both parties, Conklin made a motion for a mistrial, predicated on the prosecutor's reading from *Myrick v. State*, supra. The denial of this motion is the basis of his 12th enumeration of error.

(a) Conklin argues that the law read by the state is no longer valid and that it should not have been brought to the jury's attention.

We note that what the prosecutor read stated that a "presumption *may* arise," not that it "*shall* arise" or that "the law presumes." In any event, the trial court specifically told the jury that it would be instructed as to the law by the court, and that what the lawyer read to the judge was not to be taken by the jury as the law. Moreover, "malice aforethought comprises two elements: intent to kill and the absence of provocation or justification." *Franklin v. Francis*, ___ U. S. ___ (___ SC ___, ___ LE2d ___) (Case No. 83-1590, decided April 29, 1985) (slip opinion at p. 12). The evidence here overwhelmingly establishes intent to kill, which is the only element of malice implicated by the quote from *Myrick*. Therefore, we find no reversible error here.

(b) Nonetheless, this case demonstrates the potential for mischief inherent in the practice of "reading law." Ostensibly a procedure to acquaint the court with principles of law that it might thereafter give in charge, in fact, since the court has already determined what it in-

tends to charge, this practice is a means by which counsel can present to the *jury* principles of law (or language of an appellate opinion not espousing anything that can fairly be called a principle of law[5]) that the court is *not* going to give in charge.

The practice already has been abolished in civil cases. *Central of Ga. R. Co. v. Sellers*, 129 Ga. App. 811 (201 SE2d 485) (1973). In that case, it was stated: "In the past it could be fairly argued, that in reading the law to the court at the commencement of the argument (in the presence of the jury), counsel was informing the court of the authorities he was relying on and thus assist[ing] the court in the preparation of its charge to the jury. See *Averett v. Brady*, 20 Ga. 523 (2).

"Whatever may have been the justification for the practice in the past ended with the enactment of Code Ann. § 70-207 (b) [now OCGA § 5-5-24 (b)]. Under this latter Code section, not only must counsel submit requests to charge at or before the close of the evidence, but the court must inform counsel of its proposed action on the requests prior to counsel's argument to the jury . . .

"The practice complained of here is condemned. In all civil cases the jury shall receive the law *exclusively* from the trial judge and any departure from this rule will constitute reversible error." 129 Ga. App., supra at 814-815. (Emphasis in original.)

This rule has not heretofore been applied in criminal cases. See *Griffin v. State*, 154 Ga. App. 261 (4) (267 SE2d 867) (1980). It is true that our Constitution states: "In criminal cases . . . the jury shall be the judges of the law and the facts." 1983 Constitution, Art. I, Sec. I, Par. II. However, it has long been settled that this language, identical to that in earlier constitutions, means that jurors are "made absolutely and exclusively judges of the facts in the case, [and], they are, in this sense only, judges of the law." *Harris v. State*, 190 Ga. 258, 263 (9 SE2d 183) (1940) (quoting *Berry v. State*, 105 Ga. 683 (31 SE 592) (1898)). It is "the province of the court to construe the law and give it in charge, and of the jury to take the law as given, apply it to the facts as found by them, and bring in a general verdict." Ibid. See also *Bryant v. State*, 163 Ga. App. 872 (1) (296 SE2d 168) (1982).

A jury in a criminal case, no less than a jury in a civil case, should receive the law from the *court*, not from the attorneys.[6]

Counsel have every right to refer to applicable law during closing argument (i.e., law that the court is going to give in charge). *Garrison*

---

[5] See *Drake v. Kemp*, 762 F2d 1449 (11th Cir. 1985) (holding that reading language from *Eberhart v. State*, 47 Ga. 598, 610 (1873), to the effect that mercy is a "sickly sentimentality," rendered sentencing proceedings fundamentally unfair).

[6] In addition, attorneys ought to have the benefit of advance notice of the principles of law on which the opposition intends to rely. See *Bennett v. State*, 158 Ga. App. 421 (8) (280 SE2d 429) (1981) (reversing where defense counsel was not given an adequate opportunity to respond to points of law not raised until the state's closing argument.

*v. Rich's,* 154 Ga. App. 663 (3) (269 SE2d 513) (1980). There is no justification, however, for allowing an attorney to supplement the court's charge by reading, in the jury's presence, law that the court is not going to charge. Nor do we see any reason for having one rule on reading law in civil cases and another in criminal cases. Therefore, we take this opportunity to announce that, in the future, criminal cases, as well as civil cases, will be subject to the rule announced in *Central of Ga. R. Co. v. Sellers,* supra.

11. Enumerations 13 and 14 raise two additional complaints about the state's closing argument.

(a) At the guilt-innocence phase of the trial, the state argued: "And as the evidence pointed out, I think he's a male prostitute on top of it." Conklin moved for a mistrial, which implicitly was denied. No curative instructions were sought or given. Conklin argues here that the state improperly expressed a personal opinion not supported by the evidence.

Despite the phraseology ("I think"), this portion of the state's argument can most reasonably be interpreted as an attempt to draw an inference from the evidence and not to state an opinion based on personal knowledge of matters not in evidence. Although no direct evidence established that Conklin had committed acts of male prostitution, the evidence did show that he had participated in homosexual activity while in prison, had met the victim at an interstate highway rest area, and had engaged in non-reciprocal homosexual acts with the victim. (These facts were, of course, admitted by Conklin in order to explain his conduct, as an intrinsic part of his theory of justification or, at least, serious provocation.) Although the inference drawn by the state from these facts is rather tenuous, nonetheless, it does not so add to the nature of the evidence that *was* presented regarding Conklin's sexual activities as to require a mistrial, and we find no abuse of discretion in the denial thereof. *Felker v. State,* 252 Ga. 351, 366 (314 SE2d 621) (1984).

(b) The state's closing argument at the sentencing phase of the trial proceeded, in its entirety, as follows:

"Ladies and gentlemen, as you are aware, this is the sentencing phase of the trial. The state is proceeding on the statutory aggravated circumstance that the offense of murder was outrageously or wantonly vile, horrible or inhuman; that it involved torture to the victim or depravity of mind by the perpetrator. I think in order to get the full flavor of this case, all you have to do is look at the pictures. Each photo, and you will have these pictures out with you, clearly demonstrate beyond a reasonable doubt that this offense was vile, wantonly vile, horrible and inhuman. The evidence clearly shows that there was torture to the victim in this case because as Mr. Conklin's testimony itself shows the victim was still alive when he inflicted most of those

wounds which were approximately twenty. If you look at these exhibits again and look at the various body parts, this shows the organs that he ruthlessly and unmercifully tore out of the man's body.

"This particular photo, which is state's exhibit 64, shows how he filleted the thigh bones and cut the meat off. State's exhibit 71 shows the buttocks that were cut away from the body. And state's exhibit 70 shows another piece.

"State's exhibit 72 is a certified, exemplified copy of the previous conviction of the defendant for the offense of burglary.

"Now, ladies and gentlemen, it's never a pleasant thing when you have to deal with an issue of this sort, but we're dealing with one of the most vile and brutal crimes to come about in this county in recent memory.

"MR. CHASON: May it please the court, this argument is improper. You have already admonished the prosecutor not to make these kinds of comments. It's not based on the evidence, it's irrelevant, and it's improper. I think — I'm going to ask for a mistrial on this phase of the case at this time.

"THE COURT: I overrule the motion for mistrial.

"You are confined to the evidence, now, Mr. Turner, whatever your argument is.

"MR. TURNER: Yes, sir.

"The evidence in this case shows one thing very clearly. That is, the defendant had not one ounce, not one shred of human compassion for his victim. The evidence in this case shows total depravity of mind and of heart. That's the only way you can do something of this nature. The evidence shows, and I remind you that in his own words after the victim fell off the bed, he went after him, as he says, with the screwdriver in his hand. And as you know, after he inflicted the wounds, he went about to torture and cut up the body.

"I expect the court is going to charge you that depravity of mind can be shown through mutilation of a body after death. We expect that the evidence has shown you two things. One, that there was brutal and horrible torture involved in this particular case; and two, that after the victim was killed, he was brutally and ruthlessly cut into many small pieces. The pictures show that. I think the evidence is clear that the death penalty is an appropriate punishment, here.

"I ask you to listen to the court's charge, and I ask you, based on the evidence in this case, to do your duty as citizens of Fulton County."

A prosecutor ought not make comparisons in his closing argument between the case at hand and other cases with which he is personally familiar, nor imply that he has "canvassed all murder cases and selected this one as particularly deserving of the death penalty, thus infringing upon the jury's decision-making discretion and im-

properly invoking the prosecutorial mantle of authority." *Brooks v. Kemp*, 762 F2d 1383, 1413 (11th Cir. 1985). Accord *Conner v. State*, 251 Ga. 113 (6) (303 SE2d 266) (1983).

Here, the prosecutor argued that this case was "one of the most vile and brutal crimes to come about *in this county in recent memory*." Despite this implicit reference to other cases, from the context of the statement it can be seen that it was not so much an invocation of prosecutorial expertise as it was an apology for having to bring gruesome items of evidence to the jury's attention, and an explanation of the state's reason for doing so — i.e., the evidence was gruesome because the crime was "vile and brutal." Moreover, in view of the evidence presented to this jury, it is unlikely that prosecutorial experience or expertise played a discernible role in the jury's evaluation of the vileness and brutality of Conklin's crime.

For these reasons, we find no abuse of discretion in the court's denial of the motion for mistrial. Nor do we find any error in the court's failure to give additional curative instructions absent any request therefor.

12. Photographs of the victim's dismembered body were properly admitted at the sentencing phase of the trial. Conklin cannot now be heard to complain that the crime he committed was too horrible for the jury to observe in deciding whether or not to impose the death penalty. Enumeration 17 is without merit.

13. Absent a showing that any cognizable group was significantly underrepresented on the Fulton County jury lists, the fact that the voter list is the sole source of jurors in Fulton County provides no basis for reversal of the conviction. *Ingram v. State*, 253 Ga. 622 (1d) (323 SE2d 801) (1984). Enumeration 21 is without merit.

14. During jury deliberations, the court received a note from a juror asking about certain evidence. The trial court conferred with the attorneys and stated its intention to make no response to the note. Attorneys for both sides agreed with this course of action and no response was made.

In his 18th enumeration, Conklin contends that he personally was not present during this conference and that he was therefore denied his right to be present at all stages of his trial. For reasons discussed in *Finney v. Zant*, 709 F2d 643, 646 (11th Cir. 1983), we find that even if Conklin was absent while the note was being discussed (which is not at all clear from the record) any possible error is harmless beyond a reasonable doubt.

15. The trial court did not err by refusing to give Conklin's oral request to charge that "concealment of a crime is not evidence of depravity of mind." The manner in which a defendant attempts to conceal a crime may very well evidence depravity of mind, and did in this case. Enumeration 19 is without merit.

16. In his 20th enumeration, Conklin urges to set aside his death sentence on the ground that it is disproportionate to penalties imposed in other cases tried in Fulton County.

The state responds that it would strain reason to find that "a homosexual relationship leading to a brutal beating, followed by cutting the throat of the living victim and hanging the body upside down while the blood was drained into the bathtub, followed by a complete dismemberment of the body and disposal in a dumpster, is just a 'plain vanilla' killing in Fulton County."

We agree, and find that Conklin's death sentence is neither excessive nor disproportionate to penalties imposed in similar cases in Fulton County or in this state generally, considering both the crime and defendant. OCGA § 17-10-35 (c) (3). The similar cases listed in the Appendix support the imposition of the death sentence in this case.

17. The death penalty was not here imposed under the impermissible influence of passion, prejudice, or other arbitrary factor. OCGA § 17-10-35 (c) (1).

*Judgment affirmed. All the Justices concur.*

DECIDED JUNE 27, 1985 —
REHEARING DENIED JULY 23, 1985.

*Kenneth D. Feldman, John Thomas Chason,* for appellant.

*Lewis R. Slaton, District Attorney, Benjamin H. Oehlert III, Assistant District Attorney, Michael J. Bowers, Attorney General, Mary Beth Westmoreland, Assistant Attorney General,* for appellee.

APPENDIX.

*Blanks v. State,* 254 Ga. 420 (330 SE2d 575) (1985); *Ross v. State,* 254 Ga. 22 (326 SE2d 194) (1985); *Felker v. State,* 252 Ga. 351 (314 SE2d 621) (1984); *Conner v. State,* 251 Ga. 113 (303 SE2d 266) (1983); *Williams v. State,* 250 Ga. 553 (300 SE2d 301) (1983); *Buttrum v. State,* 249 Ga. 652 (293 SE2d 334) (1982); *Smith v. State,* 249 Ga. 228 (290 SE2d 43) (1982); *Krier v. State,* 249 Ga. 80 (287 SE2d 531) (1982); *Cervi v. State,* 248 Ga. 325 (282 SE2d 629) (1981); *Justus v. State,* 247 Ga. 276 (276 SE2d 242) (1981); *Hardy v. State,* 245 Ga. 272 (264 SE2d 209) (1980); *Baker v. State,* 243 Ga. 710 (257 SE2d 192) (1979); *Spraggins v. State,* 243 Ga. 73 (252 SE2d 620) (1979); *Redd v. State,* 242 Ga. 876 (252 SE2d 383) (1979); *Stanley v. State,* 240 Ga. 341 (241 SE2d 173) (1977); *Thomas v. State,* 240 Ga. 393 (242 SE2d 1) (1977); *Corn v. State,* 240 Ga. 130 (240 SE2d 694) (1977); *Dix v. State,* 238 Ga. 209 (232 SE2d 47) (1977); *McCorquodale v. State,*

233 Ga. 369 (211 SE2d 577) (1974).