S98A0265. BEASLEY v. THE STATE.

(502 SE2d 235)

THOMPSON, Justice.

Ronnie Jack Beasley, Jr., was convicted of malice murder, armed robbery and theft by taking a motor vehicle in connection with the death of Olin Miller.[1] Although the State sought the death penalty for

---

[1] The crimes were committed on March 18, 1995. Beasley, Angela E. Crosby, Shayne Anthony Courson, and Jason William Walsh were indicted on April 24, 1995, and charged with malice murder, armed robbery, and theft by taking a motor vehicle. The State subsequently filed a notice of intent to seek the death penalty against Beasley and his trial commenced on August 19, 1996. The jury found Beasley guilty of malice murder, armed robbery

Beasley's role in the crimes, the jury fixed his sentence at life without parole. Beasley appeals asserting, inter alia, that the trial court erred in permitting a movie, "Natural Born Killers," to be admitted into evidence and shown to the jury. Finding no reversible error, we affirm.

Viewed in a light favorable to the verdict, we find the following: Beasley lived in a trailer in Toombs County with Angela Crosby, his girl friend.[2] On the day in question, Crosby enticed the victim, Olin Miller, to the trailer to rob him and steal his truck. Beasley, Shayne Courson and Jason Walsh were hiding in a bedroom when the victim arrived.[3] Throwing a sheet over the victim, they wrestled him to the floor. During the course of the struggle, the victim bit Beasley and he retaliated by hitting the victim on the head with a beer mug. The victim began to bleed excessively and a plastic bag was placed over his head. Then Beasley placed his hands over the victim's nose and mouth until he stopped breathing.

Beasley and the others took $31 from the victim and loaded his body into his pickup truck. They dumped his body in a creek and weighed it down with rocks. Then they drove to Columbus and parted company.

Beasley and Crosby remained in the victim's truck until they were stopped for stealing gasoline. The truck was impounded, but they were released from custody.

Thereafter, Beasley and Crosby kidnapped another victim, and stole his truck. They drove to Florida, where that victim managed to escape. Beasley and Crosby were arrested soon after they returned to Georgia.

Following his arrest, Beasley confessed[4] and showed the police where the victim was buried. An autopsy revealed that the victim died as a result of blunt force trauma to the head and asphyxiation. Beasley's and Crosby's fingerprints were found in the victim's truck. Pieces of a broken beer mug were found in Beasley's trailer and the

---

and theft by taking and, following the sentencing phase of the trial, it fixed Beasley's sentence at life without parole for malice murder. On September 5, 1996, the trial court sentenced Beasley to life without parole for malice murder, life for armed robbery, and 20 years for theft by taking. Beasley's timely filed motion for a new trial was denied on June 23, 1997, and he filed a notice of appeal on June 24, 1997. The case was docketed in this Court on November 6, 1997, and submitted for a decision on briefs on December 29, 1997.

[2] The State also sought the death penalty against Crosby, but she received a sentence of life imprisonment. See *Crosby v. State*, 269 Ga. 434 (498 SE2d 62) (1998).

[3] The State did not seek the death penalty against Courson and Walsh and they were tried together. See *Courson v. State*, 269 Ga. 597 (502 SE2d 453) (1998); *Walsh v. State*, 269 Ga. 427 (499 SE2d 332) (1998).

[4] In an oral statement, Beasley said that he held his hands over the victim's nose and mouth. In a written statement, he said that Walsh and Crosby choked the victim with a rope, and that Crosby twisted the victim's neck.

creek where the victim's body was recovered.

1. The evidence was sufficient to enable any rational trier of fact to find Beasley guilty beyond a reasonable doubt of the crimes for which he was convicted. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979). See also *Barnes v. State*, 260 Ga. 398, 399 (2) (396 SE2d 207) (1990).

2. The State introduced evidence that Beasley watched the movie "Natural Born Killers" 19 or 20 times; that he had said he wanted to be like the characters in the movie; that he and Crosby sometimes used the names of characters in the movie; and that he sometimes referred to himself as "the Natural." The movie itself was introduced into evidence and shown to the jury in its entirety. It depicts a violent murder, rape, kidnapping and prison mutiny.

Beasley asserts the trial court erred in permitting the movie to be shown to the jury because it was irrelevant. We disagree.

In *Turner v. State*, 194 Ga. App. 878 (392 SE2d 256) (1990), police officers found a rented videotape in the defendant's home. The tape depicted the kidnapping of a young girl who was thrown on a bed and violently threatened with rape before she was rescued by the police. The Court of Appeals deemed the tape admissible to show the defendant's bent of mind to commit the crimes for which he was charged — kidnapping with bodily harm, rape, aggravated sodomy and theft by taking. In so doing, the appellate court observed that the jury may have made the permissible inference that the videotape encouraged the defendant to commit the crimes.

In this case, as in *Turner*, the jury may have made the permissible inference that Beasley was encouraged by the movie to commit a violent murder. After all, Beasley viewed the movie an extraordinary number of times and he identified with characters in the movie. Given these factors, we conclude that the movie was relevant to show Beasley's bent of mind. See *Wood v. State*, 255 Ga. 697 (341 SE2d 442) (1986).

It cannot be said that the trial court erred in failing to give cautionary instructions to the jury with regard to the viewing of the movie. Beasley made no request for such instructions.

3. Because one of the characters in the movie "Natural Born Killers" shaved his head, the State was permitted to introduce a photograph depicting Beasley with a shaved head.[5] The photograph was relevant to show Beasley's penchant for the movie and his bent of mind. See Division 2, supra.

4. The trial court did not err in permitting the State to show that

---

[5] Although the photograph was taken while Beasley was in prison, it does not clearly show that he was in prison garb. See *Whatley v. State*, 266 Ga. 568, 569 (2) (468 SE2d 751) (1996).

Beasley committed additional crimes after he murdered the victim or in charging the jury with regard to those crimes. Evidence of those crimes was admissible as part of "one crime spree and as evidence of [Beasley's] bent of mind and of the circumstances of his arrest. [Cits.]" *Greene v. State*, 266 Ga. 439, 445 (13) (469 SE2d 129) (1996), rev'd on other grounds, *Greene v. Georgia*, 519 U. S. 145 (117 SC 578, 136 LE2d 507) (1996). See also *Crosby v. State*, 259 Ga. 822, 823 (2) (389 SE2d 207) (1990) (subsequent acts were relevant and admissible because they were part of crime spree indicating certain course of conduct).

Beasley also contends that evidence of these additional crimes was inadmissible because the State failed to comply with the requirements of Uniform Superior Court Rule 31.3 (B). This contention is without merit. Rule 31.3 is inapplicable where, as here, the additional crimes were part of a single, continuous crime spree. USCR 31.3 (E); *Baird v. State*, 207 Ga. App. 44, 45 (427 SE2d 37) (1993). Compare *Wilkins v. State*, 266 Ga. 278, 280 (3) (466 SE2d 592) (1996) with *Grace v. State*, 262 Ga. 746, 747 (1) (425 SE2d 865) (1993).

5. Beasley enumerates error with regard to the verdict form that the trial court sent out with the jury, pointing out that it did not contain a designated space for a "not guilty" verdict. However, although the trial court displayed the proposed verdict form to counsel and invited comment, this enumeration was not asserted below. It follows that this enumeration was not preserved for appellate review. See *Brannan Auto Parts v. Raymark Industries*, 183 Ga. App. 82 (1) (357 SE2d 807) (1987). Besides, the verdict form contained nothing more than a blank space underneath each charge, and the jurors were to specify in those spaces whether Beasley was guilty or not guilty of each charge.

6. Beasley did not request a charge on voluntary manslaughter and there was no evidence to support such a request. It cannot be said, therefore, that the trial court erred in failing to give a voluntary manslaughter charge, or to include a voluntary manslaughter alternative on the verdict form. *Isaac v. State*, 263 Ga. 872, 874 (5) (440 SE2d 175) (1994).

7. The trial court properly instructed the jury that its verdict as to the penalty had to be unanimous. It was not required to instruct the jury that lack of unanimity forecloses imposition of the death penalty. *Parks v. State*, 254 Ga. 403, 416 (14) (330 SE2d 686) (1985).

8. Prior to closing argument in the penalty phase, Beasley sought permission to inform the jury that he and the State had stipulated that the State did not intend to seek the death penalty against Courson and Walsh. The jury was so informed. Thereafter, the district attorney told the jury in closing argument: "I have stipulated and agreed that I have filed no notice of our intention to seek the

death penalty on two of the four defendants in this case. I'm here to tell you that has nothing to do with Ronnie Beasley or what his sentence should be. When, or how, or whether to file a notice to seek the death penalty is a tactical consideration on the part of attorneys." At that point, Beasley's counsel interposed an objection. The trial court overruled the objection after it ascertained that defense counsel agreed to the stipulation so he could argue "another phase of it." Thereafter, Beasley's counsel argued that the jury should not impose the death penalty in this case because the State was not seeking the death penalty against Courson and Walsh.

Pointing out that a district attorney should not make comparisons between the case being tried and other cases with which he is personally familiar, *Conklin v. State*, 254 Ga. 558, 572-573 (331 SE2d 532) (1985), Beasley asserts the trial court erred in permitting the district attorney to state why the death penalty was not being sought against Courson and Walsh. This assertion is without merit. Beasley sought and introduced the stipulation so *he* could make a comparison between his case and the other cases. He cannot be heard to complain that the district attorney stole his thunder. Moreover, the district attorney's comments went no further than the stipulation itself: They did not raise the banner of prosecutorial expertise; nor did they infringe upon the jury's discretion. Id. Taken as a whole, the district attorney's remarks made it clear that whatever punishment the jury meted out — death, life without parole, or life — was a matter which was in the hands of the jury alone.

9. During closing argument in the penalty phase, the district attorney stated that the sentence should be imposed without emotion. In so doing, the district attorney added: "If . . . you were the victim and someone was sitting in judgment of somebody who victimized you." Defense counsel immediately objected, pointing out that it was inappropriate for the jury to put themselves in the victim's shoes. Before the trial court ruled on the objection, the district attorney withdrew his remarks and continued by stating: "If you had someone who was sitting in judgment of you, you would not want them to make that judgment based on emotion, but based on reason. And that's what this is all about."

Beasley asserts the trial court erred in failing to instruct the jury to disregard the district attorney's remarks. This assertion is not preserved for review because Beasley did not request a curative instruction. *Zellner v. State*, 260 Ga. 749, 751 (399 SE2d 206) (1991).

10. It cannot be said that the trial court erred in denying Beasley's request for funds for expert assistance. Beasley failed to "disclose to the trial court, with a reasonable degree of precision, why certain evidence is critical, what type of scientific testimony is needed, what that expert proposes to do regarding the evidence, and

the anticipated costs for services." *Roseboro v. State*, 258 Ga. 39, 41 (365 SE2d 115) (1988). See also *Ennis v. State*, 249 Ga. 222 (2) (290 SE2d 50) (1982).

11. Armed robbery is not a lesser included offense of malice murder where, as here, the defendant is a party to both the murder and the armed robbery of the victim. *Hoerner v. State*, 246 Ga. 374 (1) (271 SE2d 458) (1980). Compare *Fleming v. State*, 236 Ga. 434, 435-436 (224 SE2d 15) (1976) with *Burke v. State*, 234 Ga. 512, 515 (3) (216 SE2d 812) (1975). The trial court did not err in refusing to vacate Beasley's conviction for armed robbery.

12. Beasley asserts the trial court failed to conduct a hearing to determine whether the prosecution purposely discriminated against African-Americans and white males when it exercised its peremptory challenges. We disagree. The trial court made no express ruling as to whether Beasley established a prima facie case of racial and/or gender discrimination. Instead, it directly asked the prosecution to explain the reasons for its strikes. The prosecution articulated race/gender-neutral explanations for striking the jurors in question and the trial court correctly found the explanations to be legitimate and fatal to Beasley's *Batson* claim. See *Berry v. State*, 267 Ga. 605, 608 (5) (481 SE2d 203) (1997).

13. Beasley raises several *Witherspoon*[6] errors. He contends the trial court erred by having the district attorney propound *Witherspoon* questions during voir dire[7] and in permitting the district attorney to ask prospective jurors whether they would be able to sign their name to a death penalty verdict. He also asserts that two jurors who opposed the death penalty should not have been excused for cause, and other jurors who favored the death penalty should have been excused for cause. Finally, he contends the trial court erred in repeatedly rehabilitating jurors who should have been disqualified under *Witherspoon*. "Because [Beasley] did not receive the death penalty, *Witherspoon* provides no basis for reversal." *Turner v. State*, 268 Ga. 213, 217 (486 SE2d 839) (1997). In passing, we note that, in any event, the prospective jurors who were not disqualified stated that they would follow the trial court's instructions and consider all punishment options, i.e., death, life without parole, and life. Thus, in the final analysis, these prospective jurors did not exhibit a disqualifying bias.

14. Contrary to Beasley's assertion, a trial court should not be prohibited from asking prospective jurors questions which might

---

[6] *Witherspoon v. Illinois*, 391 U. S. 510 (88 SC 1770, 20 LE2d 776) (1968).

[7] See in this connection Uniform Superior Court Rule 10.1 which gives the trial court "exclusive responsibility for asking 'all Witherspoon and reverse-Witherspoon questions.'" *Curry v. State*, 255 Ga. 215, 219 (336 SE2d 762) (1985).

lead to their rehabilitation. See *Curry v. State,* supra, n. 7.

15. Beasley asserts that a prospective juror should have been excused for cause also because he was elderly and had hearing, memory, and heart problems. This assertion is without merit. The trial court asked the prospective juror a series of questions to test his awareness and memory, and he responded correctly to all of the questions. Moreover, the prospective juror served on another jury earlier in the year and the trial court indicated that it would accommodate his hearing and medical needs if that became necessary.

16. Beasley contends a prospective juror should have been disqualified because she stated that she would "probably expect more" from Beasley if he were to testify. Upon further questioning, however, this prospective juror stated that she would follow the trial court's instructions and consider Beasley's testimony to be just like that of any other witness.

17. Finally, Beasley asserts that a prospective juror should have been disqualified because he had already formed an opinion as to Beasley's guilt on the basis of reports in the news media. We disagree. That prospective juror stated that he could set his opinion aside and render a verdict based upon the evidence presented at trial. *Childs v. State,* 257 Ga. 243, 250 (8) (357 SE2d 48) (1987).

*Judgment affirmed. All the Justices concur, except Benham, C. J., Fletcher, P. J., and Sears, J., who dissent.*

FLETCHER, Presiding Justice, dissenting.

Because I believe that the jury should not have been permitted to watch the movie *Natural Born Killers,* I dissent. Whatever relevance the motion picture had to the defendant's state of mind or motive, viewing the movie in its entirety did nothing more than mislead the jury and prejudice the defendant by blurring the distinction between Ronnie Beasley, the person on trial, and Mickey Knox, the fictional character in the movie.

## FACTS

Four witnesses testified at trial that they watched the movie, *Natural Born Killers,* with Beasley. One witness watched the movie with Beasley a week before Miller's murder and heard Beasley say that he and his girlfriend were going to be like the people in the movie, go on a rampage, and kill everybody they met. Another friend testified that Beasley, while watching the movie, kept replaying a scene where the two characters break out of jail and the girl beats up the jailer. Following this testimony, the state offered the movie into evidence and announced that it would play the movie for the jury. When the defendant objected on the grounds of relevance, the state

argued that the movie was relevant because it showed Beasley's motive. Without previewing the movie, giving any rationale for its decision, or instructing the jury on the purpose of the evidence, the trial court allowed the movie to be shown in its entirety to the jury.

According to reviewers, the movie *Natural Born Killers,* directed by Oliver Stone, is a "satire of America's fascination with ultraviolent characters."[8] There is "a story line, of sorts: Mickey, an escaped criminal, meets Mallory, who is sexually terrorized by her slobbering father."[9] After killing Mallory's parents, the couple kill 52 people during a three-month crime spree that ends after their arrest for robbing a drugstore. They are sent to jail where prison inmates, inspired by a tabloid news show interview of Mickey on Super Bowl Sunday, "riot, allowing Mickey to engineer a reunion with Mallory, who is being sexually assaulted by a deranged expert on mass murderers."[10] "The movie is not simply about their killings, however, but also about the way they electrify the media and exhilarate the public," generating fame, fan clubs, and t-shirts.[11] As one teenager says on the fictional television news, " '[I]f I were a mass murderer, I'd be Mickey and Mallory.' "[12]

At Beasley's trial the state argued that it was obligated to show the movie to explain Beasley's motive. During closing arguments, the prosecutor told the jury:

> We're not asking you to do anything to Ronnie Beasley because he watched this movie 19 or 20 times. We do think it says a good bit about the motivation. . . . They did what was in that movie. Oh, they did a small time version of it. It wasn't killing everybody they saw, but that's exactly what they were doing, that's exactly how they were heading, that's exactly the way they did things. . . . To ignore the *Natural Born Killer* element would have been incompetent and unfair to you, because it would have to be going through your minds, Why would anybody do something like this?

The defendant had an alternative theory for the state's showing of the movie: the state wanted jurors to believe that Beasley turned into "Mickey" because then "you can disguise him, depersonalize him, and

---

[8] Joseph McBride, Mr. Showbiz Movie Guide: *Natural Born Killers* <http://www.mrshowbiz.com/reviews/moviereviews/movies/28277.html>

[9] Hal Hinson, Washington Post, *Natural Born Killers,* Aug. 26, 1994 <http://www.washingtonpost.com/wp-snaturalbornkillersrhinson_a0628c.html>

[10] Id.

[11] Roger Ebert, Chicago Sun-Times, *Natural Born Killers,* <http://www.suntimes.com/ebert/ebert_reviews/1994/08/937174.html>

[12] Id.

kill him." In its final jury charge, the trial court again failed to instruct the jury concerning the movie's evidentiary role.

## MOTION PICTURES AS EVIDENCE

Photographs, audio and video recordings, and motion pictures are demonstrative evidence, defined as "evidence addressed directly to the senses without intervention of testimony."[13] Like other evidence, demonstrative evidence can be classified as either direct or circumstantial. It also may be classified as "real" evidence if it plays a direct part in an incident leading to trial or illustrative evidence if offered to make other evidence more comprehensible to the trier of fact.[14] However classified, the admissibility of a photograph, audio and video recording, and motion picture lies within the discretion of the trial court,[15] which may consider its length, relevance, and prejudicial effect.

Photographs, audio and video recordings, and motion pictures are treated as real evidence when they capture events or statements related immediately to an event.[16] In *Gates v. State*,[17] we held admissible a video recording in which the defendant confessed to the crime, distinguishing his "pictorial confession" from the "posed reenactment of the crimes."[18] Similarly, a video recording of a crime may be admissible under OCGA § 24-4-48 or when a camera operator or eyewitness testifies that the tape recording accurately portrays what the witness saw take place.[19] Finally, we have found no error in the admission of four adult movies and a witness's description of one movie in a murder case involving rape and aggravated child molestation when the movies were not shown to the jury.[20]

---

[13] Black's Law Dictionary 389 (5th ed. 1979).

[14] 2 John W. Strong, McCormick on Evidence § 214 (4th ed. 1992).

[15] *Jones v. State*, 250 Ga. 498, 499 (299 SE2d 549) (1983).

[16] Paul S. Milich, Georgia Rules of Evidence § 7.3.

[17] 244 Ga. 587, 591 (261 SE2d 349) (1979).

[18] See also *Isaacs v. State*, 259 Ga. 717, 733 (386 SE2d 316) (1989) (trial court did not err is allowing audio recording of filmmaker's interview in which defendant confessed to four killings and rape).

[19] See *Long v. General Elec. Co.*, 213 Ga. 809, 810 (102 SE2d 9) (1958) (admitting motion picture film of union members charged with violating injunction after camera operator testified that the film correctly portrayed what he saw as he was filming); see also *Tolver v. State*, 269 Ga. 530 (500 SE2d 563) (1998) (affirming admission of crime surveillance tape based on the testimony of store supervisor on store procedures, GBI agent who found the stolen tape, photographer who repaired it, and investigator who copied it); *Stephens v. State*, 239 Ga. 446, 447 (238 SE2d 29) (1977) (admitting film and clerk's testimony concerning another armed robbery 20 minutes after armed robbery for which defendant was being tried). But see *Phagan v. State*, 268 Ga. 272, 279 (486 SE2d 876) (1997) (ruling that video recording of defendant and minor engaged in sexual conduct was inadmissible at trial due to lack of authentication).

[20] See *Caldwell v. State*, 263 Ga. 560, 564-565 (436 SE2d 488) (1993).

Photographs, audio and video recordings, and motion pictures are illustrative evidence when prepared for litigation to aid the trier of fact in understanding the issues and facts at trial.[21] In *Eiland v. State*,[22] an early case dealing with the admissibility of a "posed movie" reenacting a crime, the Georgia Court of Appeals rejected the film as evidence because it differed from reality in substantial ways and became an extra witness for the state. The court explained:

> photographs and especially movies which are posed, which are substantially different from the facts of the case, and which because of the differences might well be prejudicial and misleading to the jury, should not be used, and this is especially true where the situation or event sought to be depicted is simple, the testimony adequate, and the picture adds nothing except the visual image to the mental image already produced.[23]

That court concluded that there was no purpose to the film except to make more vivid the state's argument that the defendant was fleeing arrest because he knew a companion had drugs.

Relying on the *Eiland* decision, we recently reversed a trial court's approval in a death penalty case of the state's use of a video recording that reenacted the defendant's murder of a deputy sheriff. In *Pickren v. State*,[24] we outlined the criteria for considering when the reenactment of a crime may be admitted as "demonstrative evidence," whether admitted into evidence or used for illustration only. The party who seeks to use the video reenactment must show that (1) it is a fair and accurate representation of the event in question; (2) the reenactment was filmed under conditions substantially similar to those existing at the time of the event; and (3) the recording's visual image adds something to the mental image already produced by oral testimony, due either to the event's complexity or the inadequacy of the testimony.[25] This decision is consistent with earlier cases from both appellate courts in this state.[26]

---

[21] Milich, supra, note 9, § 7.3.
[22] 130 Ga. App. 428 (203 SE2d 619) (1973).
[23] Id. at 429.
[24] 269 Ga. 453 (500 SE2d 566) (1998).
[25] Id. at 455-456.
[26] See *Cornell v. State*, 265 Ga. 904, 905 (463 SE2d 702) (1995) (excluding defendant's computer reenactment of crime for inadequate foundation); *Keith v. State*, 186 Ga. App. 273, 274 (367 SE2d 255) (1988) (excluding defendant's videotape of circumstances leading to his arrest); *City Council of Augusta v. Lee*, 153 Ga. App. 94, 99 (264 SE2d 683) (1980) (excluding posed film of scene at site of collision).

## APPLYING THE RULES OF EVIDENCE TO A FICTIONAL FILM

In this case, the movie *Natural Born Killers* may be classified as both real and illustrative evidence. The actual tape of the movie is "real" evidence in that it is directly related to the crimes at trial. Witnesses testified that Beasley had watched the movie 19 or 20 times, bragged of duplicating the crimes of the fictional mass murderers, and imitated the film's self-proclaimed natural born killer by referring to his girlfriend as Mallory and shaving his head. Because of this relevant testimony, the trial court did not abuse its discretion in admitting the physical tape into evidence or in allowing testimony related to Beasley's fascination with the movie.

In contrast to the actual tape, the contents of the movie are illustrative evidence in that the film tells a fictional story, which Beasley admired, of mass murderers who obtain celebrity status. Like the movie reenactments in *Eiland* and *Pickren,* the movie here presents the state's theory that Beasley killed Olin Miller as his petty imitation of Mickey Knox's crime spree. In the words of the state prosecutor, Beasley "did what was in that movie. Oh, they did a small time version of it. It wasn't killing everybody they saw, but that's exactly what they were doing . . . that's exactly the way they did things."

In this case, the state failed to meet any of the standards for admission of movies as set out in *Pickren*. There are, however, substantial differences between showing a "posed" reenactment of a crime and a Hollywood motion picture that foretells a crime. As a result, our decision in *Pickren* provides only limited guidance in deciding the evidentiary issue in this case.

Rather, the more appropriate test to apply in considering the admissibility of a fictional motion picture is the general one related to relevancy — whether the probative value of the evidence outweighs its prejudicial effect.[27] In applying this test, courts should weigh the purpose of the evidence, the adequacy of the direct testimony, and the need for a visual image against the time required to view the movie, the likelihood of jury confusion between fiction and fact, and the unfair prejudice to the defendant.

Considering these factors, the trial court abused its discretion in allowing the jury to view the movie *Natural Born Killers* in its entirety. As an initial consideration, the probative value of the film is questionable. At trial, the state offered the movie to prove motive. What is not clear from the record is whether the state contended that Beasley was seeking to imitate the murders committed in the movie or to emulate the celebrity status of the movie's mass murderers. If,

---

[27] See *Carroll v. State,* 261 Ga. 553, 554 (408 SE2d 412) (1991).

as suggested by the testimony and closing arguments, the state presented the movie to show that Beasley was attempting a copycat killing, then the testimony of the murder was adequate and the motion picture added nothing except the visual image to the mental image already produced.

Perhaps because of the weakness of the state's rationale at trial, the majority opinion relies on a different purpose, concluding that the movie was relevant to show Beasley's bent of mind "to commit a violent murder." It cites the Court of Appeals decision in *Turner v. State*.[28] In that case, the jury was allowed to view a "sex and violence tape" found in Turner's home because it may have encouraged his perpetration of the crimes of kidnapping, sodomy, and rape. Based on this broad reasoning, any book, movie, record, or television program that includes a crime similar to the one with which an accused is charged would be relevant to show that individual's bent toward criminal activity. Under this expansive test, reading the works of Nobel prize-winning authors like Toni Morrison and William Faulkner can become evidence that an accused had a "bent of mind" to commit murder. Because this rationale is simplistic and overreaching, I find it unpersuasive as a basis for allowing the jury to view the movie in this case.

The testimony at trial, moreover, was adequate to describe the movie's connection to Beasley and his crimes. The witnesses detailed Beasley's obsession with the movie, his boastful claims to be like the movie characters and kill everybody he met, and his symbolic efforts to imitate his fictional hero. It is unclear what critical evidence the moving pictures added to the state's case other than to become an "extra witness." As an additional witness, the film presented "evidence" to the jury of murder and mayhem that differed substantially from the reality of the crimes that the defendant was accused of committing. By using "bent of mind" as a rationale for the showing of a gruesome murder film, the majority is allowing a lower standard of relevancy and admissibility for fictional films than for video reenactments of the actual crime in question.

Weighed against the movie's weak probative value is its prejudicial effect. First, the jury spent two hours watching a movie that was, at best, tangentially related to the accused's crimes, as well as being forced to view a garish and excessive story that those with strong sensibilities may not have chosen to see voluntarily. Second, given the power of the medium and the length of the film, there is a likelihood that the movie would mislead the jury into confusing the crimes of Mickey Knox with the crimes that Beasley was accused of commit-

---

[28] 194 Ga. App. 878, 880 (392 SE2d 256) (1990).

ting. Even if the jury could separate the movie crimes from the murder of Olin Miller, the movie tends to obfuscate the issue of what Beasley did with what he said he intended to do.

Third, the potential for prejudice in this instance was enormous. The name of the movie, much less its portrayal of two mass murderers committing 52 murders, invites prejudice. No court would allow a jury to watch a film about the Holocaust as "evidence" in the trial of a person accused of killing a Jew, even if the defendant had delusions that he was Hitler. "[N]ot only is the danger that the jury may confuse art with reality particularly great, but the impressions generated by the evidence may prove particularly difficult to limit."[29] In this case, the sensational account of 52 murders during a fictional three-month crime spree added little to Beasley's trial except possible confusion and unfair prejudice. Therefore, the jury should not have been allowed to view the movie.

I am authorized to state that Chief Justice Benham and Justice Sears join in this dissent.

DECIDED JULY 13, 1998 —
RECONSIDERATION DENIED JULY 30, 1998.

*Stubbs & Associates, M. Francis Stubbs, Layne & Layne, Alan P. Layne,* for appellant.
*Richard A. Malone, District Attorney, Thurbert E. Baker, Attorney General, Paula K. Smith, Senior Assistant Attorney General, Deborah L. Gale, Assistant Attorney General,* for appellee.

---

[29] McCormick on Evidence § 214.