S98A0259. RUSHIN v. THE STATE.
(502 SE2d 454)

HINES, Justice.

A jury found Gerald Nathaniel Rushin guilty of malice murder, two counts of felony murder, armed robbery, and aggravated assault in connection with the fatal shooting of convenience store employee Cindy Ray Pierce.[1] Rushin contends that his convictions should be overturned because the trial court admitted into evidence a video-tape of a movie, "Menace II Society," and permitted the jury to view a portion of it. Allowing such evidence in this case fails to provide a basis for reversal, and we affirm.

Viewed in favor of the verdicts, the evidence at trial showed that shortly after 10:15 p.m. on Thanksgiving 1995, Rushin, Robert Tolver, and Stanley Simon,[2] arrived at the Holiday Market convenience store in Poulan, Georgia. The three entered the store and Rushin drew his .25 caliber handgun from his pocket and pointed it at the clerk, Cindy Ray Pierce. Rushin directed Pierce to give him the money from the cash register and the surveillance videotape from the recorder under the counter, which she did. Pierce pleaded, "please don't hurt me, please." Rushin then fired a close range shot at Pierce, the bullet striking her just below the left ear and penetrating her carotid arteries and her pharynx. Pierce dropped to the floor and managed to crawl to the telephone. As she attempted to pick it up, Rushin ordered, "put the phone down, bitch." Pierce tried to crawl in the other direction and then collapsed. The men fled with approximately $150 from the register and the store's surveillance tape. A customer discovered Pierce's body at approximately 10:30 p.m.

---

[1] The crimes were committed on November 23, 1995. On January 22, 1996, a Worth County grand jury indicted Rushin for malice murder, murder while in the commission of armed robbery, murder while in the commission of aggravated assault, armed robbery, and aggravated assault. Rushin was tried on April 24-25, 1996, and found guilty of all charges. On April 25, 1996, he was sentenced to life imprisonment for malice murder and to a consecutive life sentence for armed robbery. The aggravated assault merged for the purpose of sentencing, and the felony murder counts stood vacated by operation of law, OCGA § 16-1-7. Rushin filed a motion for new trial on May 7, 1996, and an amended motion for new trial on July 29, 1997. Rushin was denied a new trial on October 2, 1997, and he filed a notice of appeal on October 20, 1997. The appeal was docketed in this Court on November 5, 1997. The case was submitted for decision without oral argument on December 29, 1997.

[2] Both Tolver and Simon were indicted in connection with the slaying of Cindy Ray Pierce. Tolver has been tried and convicted of malice murder and armed robbery. See *Tolver v. State*, 269 Ga. 530 (500 SE2d 563) (1998).

Shortly thereafter, Rushin confided to a 15-year-old acquaintance that he had killed Pierce and detailed the murder, including that he had taken the store videotape. The boy told his father what Rushin had related and they called the sheriff.

Rushin gave a statement to GBI agents in which he admitted robbing Pierce at gunpoint, but claimed that his handgun discharged accidentally when Pierce "threw something that hit my gun and it just went off and hit her." Rushin further stated that he had gotten the store videotape, but claimed that he had burned it. He later told an agent where the tape could be found. It was recovered, salvaged, and played for the jury. Rushin's handgun was also recovered, and a forensic microanalyst found that the handgun fired the bullet retrieved from Pierce's body. The handgun required a force of 12 pounds applied to the trigger in order to fire it, which is a high degree of force needed to discharge such a weapon.

Rushin had talked to friends about going into a "line of crime" and robbing a store; on prior occasions, he was seen wielding a handgun and during an argument with a female friend, he put the gun to her head and said he would blow her head off.

At trial, Rushin denied any participation in the crimes and claimed that he made his inculpatory statements to authorities in order to take the blame for his friend Simon.

1. The evidence was sufficient to enable any rational trier of fact to find Rushin guilty beyond a reasonable doubt of the crimes for which he was convicted. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. The State presented additional evidence that Rushin owned a videotape of the movie, "Menace II Society" and had viewed it on at least half a dozen occasions; Rushin particularly liked a character in the film named "O-dog" and often mentioned him; Rushin talked about how "O-dog" was "bad" and how "O-dog" "mixed it up." A videotape of "Menace II Society" was admitted into evidence, and the trial court allowed the jury to view a portion of the film which included a scene depicting "O-dog" and his cohorts brutally shooting store clerks during a convenience store robbery and taking the store's surveillance videotape.[3] The trial court instructed the jury that its consideration of the film was for the limited purpose of any bearing on the defendant's bent or state of mind at the time of the incident on trial, and that if after viewing the movie scene, it was determined that the film had no such bearing, the jury was to totally and completely disregard it.

Rushin maintains that the introduction of the evidence placed

---

[3] The record fails to disclose with certainty the footage viewed by the jury.

his character in issue in violation of OCGA § 24-9-20 (b).[4] But evidence of a movie in a criminal defendant's possession which depicts the conduct with which the defendant is charged may be admissible to show the defendant's bent of mind. *Caldwell v. State*, 263 Ga. 560, 564 (436 SE2d 488) (1993). The fact that it may place the defendant's character incidentally into question does not make inadmissible what otherwise is relevant and material to the issues on trial. *Id.; Wood v. State*, 255 Ga. 697, 698 (4) (341 SE2d 442) (1986). In this case, where the State's evidence showed Rushin's fascination with the movie at issue and that the criminal activity charged and committed mirrored conduct in the film, the excerpt shown to the jury was relevant on the questions of Rushin's bent of mind as well as his modus operandi. Indeed, the jury may have made the inference that viewing the movie in some manner influenced Rushin to commit the brutal acts against Cindy Ray Pierce. *Beasley v. State*, 269 Ga. 620 (502 SE2d 235) (1998); *Turner v. State*, 194 Ga. App. 878, 879 (2) (392 SE2d 256) (1990).

Even if we were to conclude that it was error to admit the film into evidence and to allow the jury to view the portion it did, no harm can be shown because the evidence against Rushin was overwhelming, making it highly probable that the introduction of the videotape of "Menace II Society" did not contribute to the jury's judgments of Rushin's guilt. *Johnson v. State*, 238 Ga. 59, 61 (230 SE2d 869) (1976).

*Judgments affirmed. All the Justices concur, except Benham, C. J., Fletcher, P. J., and Sears, J., who dissent.*

FLETCHER, Presiding Justice, dissenting.

Because the prejudicial effect of showing a fictional version of crimes that the defendant did not commit outweighs the probative value of their similarities to the crimes he did commit, I dissent.

Prior to trial, the state filed a notice of its intent to present evidence of "logically related transactions" in the form of the movie *Menace II Society*. The movie is "an unsentimental and yet completely involving story of a young man who cannot see a way around his fate"; it "looks unblinkingly at a street culture that offers its members few choices that are not self-destructive."[5] The state sought to present as evidence the portion of the movie where two young, African-American males enter a store, confront an employee, rob and kill

---

[4] Relying on *Brown v. State*, 250 Ga. 862 (302 SE2d 347) (1983), Rushin also argues that such evidence was not admissible absent a showing of compelling necessity. However, *Brown* addresses the admission of photographs which depict the victim after autopsy incision or other alteration by authorities or medical personnel.

[5] Roger Ebert, Chicago Sun-Times, Menace II Society, May 26, 1993 <http://www.suntimes.com/ebert/ebert-reviews/1003/05/859427.html>

her and another person, and take the security videotape to conceal their identity. One reviewer described this segment as follows:

> The movie opens as Caine[, the movie's central character,] and O-Dog, his heedless, violent friend, enter a Korean grocery store to buy a couple of beers. The grocer and his wife, who don't want trouble, ask them to make their purchase and leave. Caine and O-Dog engage in a little meaningless verbal intimidation, aware that because they are young and black they can score some points through the couple's fear. "I feel bad for your mother," the grocer says as they are about to leave. That is all O-Dog needs to hear, and he murders the grocer and then forces his wife to hand over the store's security videotape before killing her, too.[6]

In its motion, the state sought to present the movie for the "limited" purpose of showing the defendant's motive, intent, course of conduct, bent of mind, identity, preoccupation with the movie, and propensity to emulate the actor's conduct; the state also contended that the movie would corroborate statements made by witnesses to Rushin's crime. At a pre-trial hearing where the trial court viewed the movie scene, the state argued that Rushin's case "is on all fours" with the movie because Rushin, like O-Dog, wore khaki pants, held his gun at a certain angle, and asked his victim for the store's security tape. Rushin argued that the movie was not similar and that its only purpose was to substitute the pictorial image of the film's shooting and robbing for the crimes at trial. When the defendant renewed his objections at trial, the trial court instructed the jury to consider the evidence only as it related to Rushin's bent of mind or intent. The jury then viewed a portion of the movie, which the prosecutor stopped after the convenience store robbery was completed.

1. For a separate offense to be admissible as an independent act, the state must show that the accused committed the other act.[7] The state did not attempt to show here that Rushin committed the robbery and murder in *Menace II Society*. Therefore, the trial court was correct in implicitly rejecting the movie as evidence of a "similar transaction."

2. In considering whether a jury should be allowed to view a movie showing similar crimes, trial courts should determine whether the probative value of the evidence outweighs its prejudicial effect. Among the factors to consider are (1) the purpose of the evidence; (2) the adequacy of the direct testimony; (3) the need for a visual image;

---

[6] Id.
[7] *Williams v. State*, 261 Ga. 640 (409 SE2d 649) (1991).

(4) the time required to view the evidence; (5) the likelihood of jury confusion; and (6) the unfair prejudice to the defendants.[8]

A review of these factors shows that the trial court abused its discretion in allowing the jury to view the opening scene of *Menace II Society*. The trial court and this Court state that the movie was admissible to show Rushin's intent, bent of mind, and modus operandi. Although these are permissible purposes, the oral testimony of witnesses adequately described Rushin's intent, state of mind, and methods. Witnesses testified that they watched the movie with Rushin, who had seen it at least five times; he was interested in the character who robbed the store and shot the victim; and Rushin talked with a friend about robbing a store. A high school classmate testified that after the murder Rushin told him he went in the store, pulled a gun, shot the lady in the neck, told her to "put the phone down, bitch," and got the store videotape. Rushin told his classmate that he shot only one time because he had just one bullet in the gun's chamber, having spilled the rest. In his custodial statement, Rushin admitted that he robbed the store, asked the victim to give him the store surveillance tape, and then shot the victim, although he claimed the shooting was an accident. In addition, the state introduced the actual store videotape that shows the victim at the counter and an arm raised holding a gun, thus providing a visual image that disputes Rushin's accident defense. Given the adequacy of this oral and video testimony in describing how Rushin committed the crimes, the film was unnecessary to provide an additional visual image to prove intent, bent of mind, or modus operandi.[9]

The real purpose of the movie was to provide a more explicit visual picture of the state's theory that Rushin committed crimes similar to the movie's crimes. In contrast to the store videotape, which had only fuzzy black and white images and ended before the shooting, the movie presented a clear and colorful image of two senseless murders. The movie thus served as a dramatic state witness who blurred fact and fiction but who was not subject to cross-examination. Despite the trial court's attempt to limit the purpose of the movie, the impressions generated by motion pictures are particularly difficult to limit.[10] Because of the highly prejudicial nature of the film as evidence and the difficulty inherent in limiting its message solely to proper purposes, I conclude that the movie's unfair prejudice to the defendant outweighed its scant probative value. Therefore, the trial court abused its discretion in allowing the state to present a portion

---

[8] See *Beasley v. State*, 269 Ga. 620 (502 SE2d 235) (1998).

[9] See *Tolver v. State*, 269 Ga. 530 (500 SE2d 563) (1998) (jury convicted Rushin's co-defendant without having seen any portion of *Menace II Society*).

[10] See McCormick on Evidence § 214.

of the movie to the jury.

I am authorized to state that Chief Justice Benham and Justice Sears join in this dissent.

DECIDED JULY 13, 1998.

*Noel G. Perry,* for appellant.

*C. Paul Bowden, District Attorney, Thurbert E. Baker, Attorney General, Paula K. Smith, Senior Assistant Attorney General, Elizabeth L. Jaeger, Assistant Attorney General,* for appellee.